**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONTRARIAN EMERGING MARKETS, L.P., GMO EMERGING COUNTRY DEBT FUND, GMO EMERGING COUNTRY DEBT INVESTMENT FUND PLC, and GMO EMERGING COUNTRY DEBT (UCITS) FUND, Individually and On Behalf of All Others Similarly Situated, | 20 Civ. 5890 |
| Plaintiffs, | **COMPLAINT** |
| -against- | JURY DEMAND |
| THE REPUBLIC OF ECUADOR, | |
| Defendant. | |

Plaintiffs Contrarian Emerging Markets, L.P., GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund, by their attorneys, bring this federal securities class action on behalf of all tendering and non-tendering holders of Eligible Bonds (defined below) from the Republic of Ecuador between July 20, 2020 and July 31, 2020 (the "Class Period"). Plaintiffs allege the following:

## NATURE OF THE ACTION

1.     This action is brought by Plaintiffs Contrarian Emerging Markets, L.P. ("Contrarian") and GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund (collectively, the "GMO Funds") against Defendant Republic of Ecuador (the "Republic" or "Ecuador") for violations of the federal securities laws arising from a coercive exchange, or tender offer for $17.4 billion of the Republic's outstanding bonds (the "Proposal"), based on materially false and misleading statements made by the Republic in a press release on July 27, 2020 (the "Press Release") and in

1

the underlying transaction documents.[1]  The tender offer expires on Friday, July 31, less than two weeks after it was commenced.  The Republic's false and misleading Press Release and statements are designed to deceive and mislead bondholders about the coercive nature of the tender and exchange offer, which deprives bondholders of key protections and subjects bondholders to harshly inequitable treatment should they decline to consent.  If the tender offer goes forward based on this false and misleading information, the Court will be without power to unscramble the proverbial egg and restore Plaintiffs and other bondholders to their previous positions.

2.      If the tender offer is permitted to go forward on the basis of the Republic's false and misleading statements, Plaintiffs will be irreparably harmed.  Plaintiffs and other bondholders will be forced to either consent to the unfavorable terms of the Proposal – which seeks to eviscerate the bargained-for protections that bondholders relied upon in deciding to invest in securities of the Republic – or will risk facing the significantly less favorable treatment that the Proposal imposes upon non-tendering bondholders.  Courts have enjoined tender offers where, as here, false and misleading information has been disseminated by the issuer.  Such relief is necessary here to prevent the Republic from implementing its coercive, one-sided Proposal upon investors through fraudulent and misleading statements.

3.      Furthermore, a suit for money damages will be inadequate.  As explained more fully below, the Republic is admittedly insolvent and has indicated in clear terms that it intends to oppose efforts to collect on its defaulted debt.  If this coercive Proposal is not enjoined, Plaintiffs will be deprived of any opportunity to adequately recover from the Republic.

---

[1] A true and correct copy of the Republic of Ecuador's Press Release, dated July 27, 2020, is attached as Exhibit 1.

4.      Plaintiffs, as part of a group of bondholders, objected in writing to Ecuador that the coercive tender offer violates the provisions of their bonds because it discriminates against non-tendering bondholders.  The tender offer gives substantially greater consideration to tendering bondholders in violation of the plain language of the bonds which requires that existing bondholders receive "no less favorable treatment" in any exchange offer.  Instead of receiving no-less-favorable treatment as required, non-tendering bondholders are punished on the back-end of the tender offer and are given inferior bonds which have less value and are denied any past due interest.  Further, in the event that the tender is not entirely successful because the requisite consent thresholds for its acceptance for some of the bonds are not achieved, Ecuador has made clear that it will not make payment on the existing bonds.

5.      The terms of the tender offer are set forth in an Invitation Memorandum dated July 20, 2020 (the "Invitation Memorandum"),[2] in which Ecuador has solicited tenders from existing bondholders to approve the restructuring, but bondholders who tender receive far better terms than those who do not.  Tendering bondholders will receive a combination of newly-issued bonds (the "New Securities") representing significantly greater value – offering higher interest rates, shorter maturities, and better non-economic terms – than the existing bonds held by non-tendering bondholders that will be non-consensually modified under the Proposal (the "Modified Bonds"). Furthermore, if the tender is approved, all bondholders will see their accrued and unpaid interest eliminated, but only those who tender by July 31, 2020 will receive an additional bond for past due interest (a so-called "PDI Bond") that gives them back 86% of their accrued and unpaid interest.  By contrast, existing bondholders who decline to tender will get 0% – none – of their accrued and unpaid interest.  Far from ensuring that existing bondholders receive terms that "are

---

[2] A true and correct copy of the Invitation Memorandum, dated July 20, 2020, is attached as Exhibit 2.

no less favorable" than those of the new bond offering, Ecuador has announced a plan that gives some bondholders – those who decline to tender or who tender late – terms that are dramatically worse.  Bondholders have until Friday, July 31 to tender.  Thus, the tender offer is not only an undeniable breach of the terms of the existing indentures, but coercive in the extreme.

6.     Further, the Invitation Memorandum – which contains important disclosures relating to the tender offer – makes perfectly clear in the very first risk factor that in the event some or all of the tender is not successful the Republic does not intend to pay a penny to any non-tendering bondholders on those bonds.  To further compound the pressure on non-tendering bondholders, the Invitation Memorandum makes clear that if one or more series of bonds are not tendered, the Republic will seek to make other changes to the bonds to further diminish their value and curtail the rights of bondholders.

7.     Through a false and misleading press release, Ecuador has made material misrepresentations about, among other things, the lack of coercion in the tender offer and the transparency of the process.  As explained more fully below, these statements are not only materially false and misleading, but contradict other statements made by Ecuador in the Invitation Memorandum.  Nothing compelled Ecuador to misrepresent the process by which the tender offer was negotiated, except an apparent intent to deceive investors.  Unless Ecuador is enjoined from soliciting, promoting, or implementing the tender offer, corrective disclosures ordered, and future violations of the federal securities laws enjoined, Plaintiffs and other bondholders will suffer irreparable harm.

## PARTIES

8.     Plaintiff Contrarian Emerging Markets, L.P. is organized under the laws of the State of Delaware, with its registered office located at 251 Little Falls Drive, Wilmington, Delaware 19807, United States.  Contrarian operates as an investment fund, which is managed by Contrarian

Capital Management, LLC.  Contrarian holds hundreds of millions of dollars of bonds issued by the Republic of Ecuador that are subject to the tender offer.  Contrarian's Ecuadorian bonds are held in the United States through Wells Fargo Securities, LLC.

9.      Plaintiff GMO Emerging Country Debt Fund is organized under the laws of the Commonwealth of Massachusetts, with its registered office located at 40 Rowes Wharf, Boston, Massachusetts 02110.  GMO Emerging Country Debt Fund operates as an investment fund, and is managed by Grantham, Mayo, Van Otterloo & Co. LLC.  GMO Emerging Country Debt Fund holds more than $100,000,000 of bonds issued by the Republic of Ecuador that are subject to the tender offer.

10.     Plaintiff GMO Emerging Country Debt Investment Fund plc is organized under the laws of Ireland, with its registered office located at 78 Sir John Rogerson's Quay, Dublin 2, Ireland. GMO Emerging Country Debt Investment Fund plc operates as an investment fund, which is managed by Grantham, Mayo, Van Otterloo & Co. LLC.  GMO Emerging Country Debt Investment Fund plc holds tens of millions of bonds issued by the Republic of Ecuador that are subject to the tender offer.

11.     Plaintiff GMO Emerging Country Debt (UCITS) Fund is organized under the laws of Ireland, with its registered office located at 78 Sir John Rogerson's Quay, Dublin 2, Ireland. GMO Emerging Country Debt (UCITS) Fund operates as an investment fund, and is managed by Grantham, Mayo, Van Otterloo & Co. LLC.  GMO Emerging Country Debt (UCITS) Fund holds more than ten million dollars of bonds issued by the Republic of Ecuador that are subject to the tender offer.

12.     Defendant Republic of Ecuador is a "foreign state" within the meaning of 28 U.S.C. § 1330 who, as explained below, has engaged in domestic transactions in its sovereign bonds where

irrevocable liability will occur and title will transfer in the United States and therefore is subject to the United States federal securities laws, including those that make securities fraud unlawful.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1337 (commerce), as Plaintiffs allege violations of Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as seek a declaratory judgment under 28 U.S.C. § 2201.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that Defendant is subject to personal jurisdiction in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

Ecuador's History of Defaults

15.     Ecuador has a long and well known history of defaulting on its legal obligations. From 1826 to 2010, Ecuador has "defaulted nine times on foreign-currency bonds and numerous times to foreign commercial-bank creditors and others, such that the sovereign has been in default for at least 109 out of the last 184 years—sixty percent of the time from 1826 through 2010."[3]

16.     Ecuador also has a legacy of political instability and corruption scandals that has been a substantial contributing factor in its economic woes and persistent sovereign debt defaults. Between 1997 and 2007, Ecuador has had eight presidents, three of whom were overthrown during periods of political unrest.  (Ex. 2, at 32.)

---

[3] Arturo C. Porzecanski, When Bad Things Happen to Good Sovereign Debt Contracts: The Case of Ecuador, 73 *Law and Contemporary Problems* 251-271, 251 (Fall 2010), *available at* https://scholarship.law.duke.edu/lcp/vol73/iss4/17 ("Porzecanski, *supra*").

17.     Since the turn of the 21st century, Ecuador has had three separate sovereign debt crises within a span of roughly twenty years.  Following each crisis, new bonds were issued with provisions designed to provide additional protections for investors and to avoid future crises.  After each crisis, history repeated itself with the only material difference being that the dollar-size of the defaults grew ever larger.

18.     In September of 1999, Ecuador defaulted on its interest payments for the so-called "Brady Bonds" (named after former U.S. Treasury Secretary Nicholas F. Brady).  One month later in October 1999, Ecuador defaulted on a Eurobond interest payment.[4]

19.     In 2008, the Republic again defaulted on $157 million in interest payments associated with approximately U.S. $3.2 billion of principal outstanding debt.  (Ex. 2, at 30.)  At the time, Ecuador's then-President Rafael Correa declared that Ecuador's foreign debt was "illegal" and "immoral."[5]

20.     Ecuador is also no stranger to abusive and hard-ball tactics to intimidate bondholders into accepting highly unfavorable restructurings of its sovereign bonds.  During the Correa administration, it was reported that after Ecuador defaulted on its bonds, it bought back its bonds at a fraction of their face value in various ways including through "a modified Dutch auction with a base price of thirty cents on the dollar."  The disclosure document for the Dutch auction made plain that Ecuador had "no intention of resuming payments on these bonds" following with the expiration date of the auction.[6]

---

[4] Congressional Research Service, "Ecuador's Brady Bond Default: Background and Implications" (Feb. 1, 2000), *available at* https://www.everycrsreport.com/reports/RL30348.html.

[5] *See* Forbes, "Boston Investment Company Sues Ecuador Over Bond Default" (Dec. 22, 2014), *available at* https://www.forbes.com/sites/nathanvardi/2014/12/22/boston-investment-company-sues-ecuador-over-bond-default/#75e809082e34.

[6] *See* Porzecanski, *supra*, at 266.

21.     During the period from 2014 to 2019, Ecuador issued billions of dollars of bonds and induced investors to purchase them by making a simple contractual promise in the indentures: if there were any subsequent restructuring, the holders of the bonds who do not tender would receive terms that "are no less favorable" than the terms of any new bond offering.  A variation of this so-called "No Less Favorable Treatment Provision" is contained in each bond issue that is subject to the $17.4 billion coercive tender offer.

22.     Now in 2020, Ecuador stands again on the precipice of default, this time on $17.4 billion of existing bonds.  In recent months, Ecuador has entered a state of serious financial distress.  This is due in large part to the severe impact of the COVID-19 pandemic on Ecuador's economy and the global decrease in demand for crude oil, as well as downturns in Ecuador's tourism, transportation, and shipping sectors.  (*See* Ex. 2 at 28-29.)  To combat this crisis, Ecuador has requested at least U.S. $2.9 billion in external financing from the International Monetary Fund, the World Bank, the International Development Bank, and the Corporation Andina de Fomento (the Development Bank of Latin America), and has received at least U.S. $1.83 billion to date. (*Id.* at 29.)  The Republic has also imposed severe austerity measures, cutting its public expenses by U.S. $1.4 billion, with plans to cut an additional $4 billion.  (*Id.*)

23.     On or about March 23, 2020, Ecuador's finance minister Richard Martinez announced that Ecuador would delay approximately $200 million in coupon payments on three series of bonds due in 2022, 2025, and 2030.[7]

---

[7] Reuters, "UPDATE 3 – Ecuador to delay bond interest payment to fund coronavirus effort" (Mar. 23, 2020), *available at* https://www.reuters.com/article/health-coronavirus-ecuador-finance-idAFL1N2BH004.

24.     In response to Mr. Martinez's announcement, the bondholders and Ecuador were able to agree to a grace period deferring certain interest payments of approximately $811 million until August 15, 2020, pursuant to a consent solicitation.

<u>Ecuador's Refusal to Negotiate in Good Faith</u>

25.     After Ecuador and the bondholders agreed to a grace period on Ecuador's interest payments, a Steering Committee (the "Committee") for a group of bondholders of which Plaintiffs are members,[8] attempted to negotiate with the Republic regarding a potential debt restructuring, but the Republic refused to engage with the Committee.   The Committee proposed a 30-day extension of the grace period to reach a resolution, which was rejected by Ecuador.

26.     The Republic instead decided to pursue discussions with another Ad Hoc Group of bondholders (the "Ad Hoc Group") and to ignore the Steering Committee.  The Republic enlisted the support of the Ad Hoc Group for its coercive tender offer and then disclosed that to the market along with the percentage of shares held by the Ad Hoc Group members in order to put further pressure on undecided or non-tendering bondholders.

27.     Rather than re-engage with the Steering Committee, as explained more fully below, Ecuador has launched a coercive tender offer to force Plaintiffs and other creditors to accept unfair terms that violate the underlying bonds the tender offer seeks to replace rather than face the draconian consequences of receiving less favorable treatment should the tender succeed or, if the tender were to fail, to being placed on the proverbial island with now worthless bonds that Ecuador does not intend to make payments on.

---

[8] Contrarian is managed by Contrarian Capital Management LLC.  The GMO Funds are managed by Grantham, Mayo, Van Otterloo & Co. LLC.  Contrarian and the GMO Funds were founding members of the Steering Committee for a group of more than 25 global investors.  This group owns bonds issued by Ecuador across the maturity spectrum with holdings in excess of 25% of all series that are subject to the Proposal, and more than 35% in certain series of bonds.

The Republic of Ecuador's Consent Solicitation and Invitation For The Tender Offer

28.     On July 20, 2020, the Republic of Ecuador commenced a coercive tender offer by which it has proposed to modify the terms of approximately U.S. $17.4 billion of bonds.  The Republic announced the tender offer in a July 20, 2020 press release, in which Ecuador falsely stated that "throughout its debt restructuring process, Ecuador engaged in good faith with its bondholders, providing information with transparency and seeking to adjust the terms of its outstanding debt while respecting inter-creditor equity."[9]  In fact, as set forth above, the Republic had refused to engage with the Steering Committee and was anything but transparent.

29.     The bonds subject to the tender offer Proposal are broadly categorized into two groups of so-called Eligible Bonds (the "Eligible Bonds") according to the Invitation Memorandum: (i) the Aggregated Eligible Bonds, which comprise all series of debt securities other than the 7.95% Notes due 2024 (the "2024 Bond"), and (ii) the 2024 Bond.  The Eligible Bonds are set forth in the following two tables:

**The Aggregated Eligible Bonds**

| Title of Security | ISIN / Common Code | Outstanding Amount | Issue Date |
|---|---|---|---|
| 10.750% Notes due 2022 | XS1458516967; XS1458514673 / 145851696; 145851467 | U.S.$2,000,000,000 | July 28, 2016 |
| 8.750% Notes due 2023 | XS1626768656; XS1626768730 / 162676865; 162676873 | U.S.$1,000,000,000 | June 2, 2017 |
| 7.875% Notes due 2025 | XS2058848826; XS2058845210 / 205884882; 205884521 | U.S.$600,000,000 | September 27, 2019 |

---

[9] A true and correct copy of the Republic of Ecuador's press release, dated July 20, 2020 is attached as Exhibit 3.

| Title of Security | ISIN / Common Code | Outstanding Amount | Issue Date |
|---|---|---|---|
| 9.650% Notes due 2026 | XS1535072109; XS1535071986 / 153507210; 153507198 | U.S.$1,750,000,000 | December 13, 2016 |
| 9.625% Notes due 2027 | XS1626529157; XS1626530320 / 162652915; 162653032 | U.S.$1,000,000,000 | May 30, 2017 |
| 8.875% Notes due 2027 | XS1707041429; XS1707041262 / 170704142; 170704126 | U.S.$2,500,000,000 | October 23, 2017 |
| 7.875% Notes due 2028 | XS1755432363; XS1755429732 / 175543236; 175542973 | U.S.$3,000,000,000 | January 23, 2018 |
| 10.750% Notes due 2029 | XS1929377015; XS1929376710 / 192937701; 192937671 | U.S.$2,125,000,000 | January 31, 2019 |
| 9.500% Notes due 2030 | XS2058866307; XS2058864948 / 205886630; 205886494 | U.S.$1,400,000,000 | September 27, 2019 |

**2024 Bond**

| Title of Security | ISIN / Common Code | Outstanding Amount | Issue Date |
|---|---|---|---|
| 7.95 % Notes due 2024 | XS1080331181; XS1080330704 / 108033118; 108033070 | U.S.$2,000,000,000 | June 20, 2014 |

The No Less Favorable Treatment Provisions of the Eligible Bonds

30.     The Eligible Bonds that are the subject of the tender offer each contain express clauses that forbid the discriminatory tender offer that Ecuador is soliciting.

31.     In or around 2014, the Republic sought to stabilize its debt market.  In response to concerns about the creditworthiness of Ecuador and to prevent Ecuador from imposing less favorable economic terms on existing bondholders during a restructuring, the Republic included a "No Less Favorable Treatment Provision" in each series of bonds that were issued between 2014 and 2019, and are the subject of the Proposal.  Each of these bonds – representing $17.4 billion in total offerings – contains identical No Less Favorable Treatment Provisions that apply in the event that the Republic should seek to restructure its debt yet again by exchanging existing bonds for new bonds of the Republic.   The No Less Favorable Treatment Provision of the applicable Indentures states:

> If any Reserved Matter Modification is sought in the context of a simultaneous offer to exchange the debt securities of one or more series for new debt instruments of Ecuador or any other person, *Ecuador shall ensure that the relevant provisions of the applicable Series of Notes, as amended by such Modification, are no less favorable to the holders of such Series of Notes than the provisions of the new instrument being offered in the exchange, or if more than one debt instrument is offered, no less favorable than the new debt instrument issued having the largest aggregate principal amount.* (emphasis added) (*See, e.g.*, Trust Indenture for 7.950% Notes Due 2024[10] (the "Indenture for 2024 Notes"), § 7.3.)[11]

32.     The above provision applies to a tender situation whereby the Republic seeks to modify existing debt of non-participating holders – as permitted under the indenture's modification provisions (the "Collective Action Clauses") – and exists to protect non-participating investors from coercion.  In such a situation, a tendering bondholder would receive a new bond via the

---

[10] A true and correct copy of the Trust Indenture for 7.950% Notes Due 2024, dated June 20, 2014, is attached as Exhibit 4.

[11] Reserved Matter Modifications include, among other things, modifications that would change the due date for the payment of principal or interest under the Notes; reduce the amount of principal amount of the Notes; and reduce the requisite consent threshold necessary to modify the terms and conditions of the debt securities or the indentures.  Non-Reserved Matter modifications are any modifications other than those constituting a Reserved Matter.  (*See, e.g.*, Ex. 4, § 1.1.)

tender, and a non-tendering investor's existing debt would be non-consensually modified.  The No Less Favorable Treatment Provision establishes limits on that modification.  Specifically, even though the non-tendering bondholder did not participate in the tender or vote in favor of the modifications that amended its debt, those modifications cannot leave the non-tendering bondholder with inferior treatment than what the tendering bondholder received.  If the tendering bondholder agreed, for example, to reduce cash interest by five percent and extend maturities by ten years, the non-tendering bondholder cannot be forced to reduce cash interest or extend maturities to a greater extent than that five percent and ten years.  In short, the non-tendering bondholder cannot be punished for exercising its right to vote against a restructuring proposal.

The Republic of Ecuador's Tender Offer

33.    Under the terms of the tender offer, the Republic seeks to solicit the consent of eligible holders to amend each series of Eligible Bonds and their respective indentures (the "Consent Solicitation").  The Republic also proposes to exchange the modified Eligible Bonds (the "Modified Bonds") for a package of the New Securities, bonds maturing in 2030, 2035, and 2040, to be issued by the Republic under a new master indenture.  Plaintiffs are the holders of several hundred million dollars of face value of the Eligible Bonds.

34.    Although the Eligible Bonds – as well as the new bonds the Republic intends to issue under the tender – are listed on the Luxembourg Stock Exchange, the transactions with Plaintiffs contemplated by the tender offer involve domestic securities transactions under the United States federal securities laws because the transfer of title and irrevocable liability occur in the United States.

35.    As set forth in the Invitation Memorandum, irrevocable liability is accomplished through the sending of consents and tender orders which, for each of the Plaintiffs, are sent from

the United States.  Further, the Invitation Memorandum makes clear that once a consent and tender is sent, it is irrevocable and binding and cannot be revoked.  (Ex. 2, at 43 ("Consents and Tender Orders may not be revoked or withdrawn at any time, except under certain limited circumstances where we make a change (adverse to the economic interests of Eligible Holders) to, or waive a material condition of, the Invitation, or otherwise are required to do so by law, in each case as determined by us [the Republic] in our sole discretion.").  Thus, the terms of the Invitation Memorandum must be agreed to by any beneficial owners of Eligible Bonds, such as Plaintiffs, as a condition of the tender.  (*Id*. at 57.)  Accordingly, irrevocable liability for the bondholder attaches when the consent and tender order is sent.

36.     Holders of Eligible Bonds, such as Plaintiffs, who hold their bonds through a "financial institution or intermediary" are instructed in the Invitation Memorandum to have their financial institution or intermediary process the Consent and Tender Order.  If the financial institution or intermediary is based in the United States, as is the case for Plaintiff Contrarian, that is an additional basis for irrevocable liability and consent to attach in the United States.

37.     Further, under the terms of the Invitation Memorandum, Global Bondholder Services Corporation ("GBSC") is the information, tabulation, and exchange agent for tender offer.  GBSC has its offices in New York, New York, (Ex. 2, at vi), and is "responsible for collecting Consent and Tender Orders and certifying to the Trustee the aggregate principal amount of the Eligible Bonds covered by Consent and Tender Orders received."  (*Id*. at 49.)  Accordingly, consent and tender orders are processed in New York.

38.     Further, the Republic's irrevocable liability for the tender and consents also occurs in New York when it accepts the consent and tender order. As explained in the Invitation Memorandum, "[a]ll questions regarding the validity, form and eligibility of any Consent and

Tender Order will be determined by us [the Republic] in our sole discretion, which determination will be final and binding.  And Ecuador "reserves the absolute right to reject (i) any and all Consent and Tender Orders that are not in proper form and (ii) any and all Consent and Tender Orders for which any corresponding agreement by us to exchange would, in the opinion of our counsel, be unlawful." (*Id.* at 55.)  Accordingly, likewise irrevocable liability for the consents and tenders for the Republic occurs in the United States when – in its sole discretion – it accepts consents and tenders and they are tabulated.

The Minimum Participation and Requisite Consent Thresholds

39.     The Invitation Memorandum establishes a "Minimum Participation Condition" whereby the Proposal will only be effective if the Republic receives the consent of holders prior to July 31, 2020 at 5:00 p.m. (Central European Time) that will result in at least 80% of the aggregate principal amount outstanding of the Aggregated Eligible Bonds being modified pursuant to the Proposed Modifications or otherwise exchanged for New Securities.  This is a substantially lower threshold than a minimum condition requiring consents and tenders of 80% of the aggregate principal amount outstanding of the Aggregated Eligible Bonds, because the Minimum Participation Condition allows for the inclusions of all series in which the bonds' Collective Action Clauses are triggered.  The Minimum Participation Condition cannot be waived by the Republic.

40.     Under the Collective Action Clauses in the bonds, the Proposed Modifications will become effective as to all holders of the Aggregated Eligible Bonds if the Republic receives the consent of holders of (i) more than 50% of the aggregate principal amount outstanding of each series of Aggregated Eligible Bonds, and (ii) not less than 66 ⅔% of the aggregate principal amount outstanding of all series of Aggregated Eligible Bonds.  With respect to the 2024 Bonds, the Proposed Modifications relating to Reserved Matters will be effective as to all bondholders if the

Republic receives the consent of holders of 75% of the aggregate principal amount outstanding in that series, whereas a Non-Reserved Matter modification requires the consent of holders of 66 ⅔% of the aggregate principal amount outstanding in that series.

<u>The Proposal Violates The No Less Favorable Treatment Provisions Of The Existing Bonds</u>

41.     The Invitation Memorandum establishes a deadline of July 31, 2020 – less than two weeks after the Proposal was commenced – for holders of Eligible Bonds to deliver consent and tender orders (the "Consent Deadline").  Under the terms of the Proposal, Eligible Holders who validly consent and tender prior to the Consent Deadline will receive a combination of the New Securities, newly-issued bonds with maturity dates in 2030 (the "New 2030 Bond"), 2035 (the "New 2035 Bond"), and 2040 (the "New 2040 Bond").  In addition, tendering bondholders will receive the New Past Due Interest Bond (the "New PDI 2030 Bond"), which represents 86% of the accrued and unpaid interest on the Eligible Bonds.  Eligible Holders who do not consent and tender their securities prior to the Consent Deadline will not receive the New PDI 2030 Bond.

42.     In consenting to the tender offer, Eligible Holders are required to irrevocably waive any accrued and unpaid interest through and excluding August 20, 2020 (the "Settlement Date"). According to the Invitation Memorandum, Eligible Holders are not entitled to receive any payments in respect of accrued and unpaid interest on the Eligible Bonds, other than the New PDI 2030 Bonds.  Therefore, the only way that Eligible Holders may receive any amount of payment in respect of accrued and unpaid interest they are due under the Eligible Bonds is to receive the New PDI 2030 Bonds by consenting and tendering per the terms of the Proposal prior to the July 31, 2020 Consent Deadline.

43.     Second, and ultimately more important from an economic perspective, if the tender ultimately is approved, existing bondholders will not all receive the same kinds – or value – of

16

new bonds in return for their current holdings.  On the contrary, existing bondholders who tender

will be able to exchange their current bonds for a mix of new bonds that are significantly more

valuable than the value that non-tendering bondholders will receive for their current bonds.[12]

44.     Bondholders who tender will receive, in exchange for their current bonds, a

combination of new bonds that mature in 2030, 2035, and 2040 (New 2030 Bonds, New 2035

Bonds, and New 2040 Bonds, respectively).  The precise breakdown of the new bonds they will

receive varies depending on the year in which the existing bond they currently hold comes due,

but for every bond series, they will tender 100% of their bonds and receive 49.53% of New 2035

Bonds in return (and a combination of other bonds that, along with the New 2035 Bonds, total

91.13%).  Chart A sets forth the breakdown of the new bonds tendering shareholders will receive.

New 2030 Bonds, New 2035 Bonds, and New 2040 Bonds also carry different interest rates, as

shown in Chart B.  Currently, New 2035 Bonds have the largest aggregate principal amount.

### CHART A: New Bond Mix

| CURRENT | 2030 | 2035 | 2040 |
|---------|------|------|------|
| ECUA 2022 | 30.00% | 49.53% | 11.60% |
| ECUA 2023 | 22.90% | 49.53% | 18.70% |
| ECUA 2024 | 30.00% | 49.53% | 11.60% |
| ECUA 2025 | 18.90% | 49.53% | 22.70% |
| ECUA 2026 | 18.90% | 49.53% | 22.70% |
| ECUA 2027 | 18.90% | 49.53% | 22.70% |
| ECUA 2027 | 18.90% | 49.53% | 22.70% |
| ECUA 2028 | 18.90% | 49.53% | 22.70% |
| ECUA 2029 | 18.90% | 49.53% | 22.70% |
| ECUA 2030 | 18.90% | 49.53% | 22.70% |

---

[12] Any argument that a difference in interest rate or maturity here would not constitute different treatment conflicts with the basic terms and definitions of many of the indentures at issue.  Specifically, the definitions of "Uniformly Applicable" and "same terms" include the "same new instrument," "the same offer on past due interest" only exclude "differences as between different series of affected debt securities which are necessary having regard to the currency of denomination."  (*See, e.g.*, Offering Circular for 10.75% Notes due 2029 at 210.)  A true and correct copy of the Offering Circular for 10.75% Notes due 2029, dated June 10, 2019, is attached as Exhibit 5.

## CHART B: New Bond Interest Rates

| New Bonds | Interest Rate Accrual | Maturity | Principal Repayment |
|---|---|---|---|
| New 2030 Bonds | 1.    From and including the Settlement Date to but excluding July 31, 2021: 0.500%;<br>2.    From and including July 31, 2021 to but excluding July 31, 2022: 5.000%;<br>3.    From and including July 31, 2022 to but excluding July 31, 2023: 5.500%;<br>4.    From and including July 31, 2023 to but excluding July 31, 2024: 6.000%;<br>5.    From and including July 31, 2024 to but excluding July 31, 2030: 6.900%. | July 31, 2030 | Principal on the New 2030 Bonds will be repaid in U.S. dollars in ten equal semi-annual installments starting on January 31, 2026 through maturity. |
| New 2035 Bonds | 1.    From and including the Settlement Date to but excluding July 31, 2021: 0.500%;<br>2.    From and including July 31, 2021 to but excluding July 31, 2022: 1.000%;<br>3.    From and including July 31, 2022 to but excluding July 31, 2023: 2.500%;<br>4.    From and including July 31, 2023 to but excluding July 31, 2024: 3.500%;<br>5.    From and including July 31, 2024 to but excluding July 31, 2025: 5.500%;<br>6.    From and including July 31, 2025 to but excluding July 31, 2035: 6.900%. | July 31, 2035 | Principal on the New 2035 Bonds will be repaid in U.S. dollars in ten equal semi-annual installments starting on January 31, 2031 through maturity. |
| New 2040 Bonds | 1.    From and including the Settlement Date to but excluding July 31, 2021: 0.500%;<br>2.    From and including July 31, 2021 to but excluding July 31, 2022: 0.500%;<br>3.    From and including July 31, 2022 to but excluding July 31, 2023: 1.500%;<br>4.    From and including July 31, 2023 to but excluding July 31, 2024: 2.500%;<br>5.    From and including July 31, 2024 to but excluding July 31, 2026: 5.000%;<br>6.    From and including July 31, 2026 to but excluding July 31, 2027: 5.500%. | July 31, 2040 | Principal on the New 2040 Bonds will be repaid in U.S. dollars in ten equal semi-annual installments starting on January 31, 2036 through maturity. |

| New Bonds | Interest Rate Accrual | Maturity | Principal Repayment |
|---|---|---|---|
|  | 7.   From and including July 31, 2027 to but excluding July 31, 2028: 6.000%.<br>8.   From and including July 31, 2028 to but excluding July 31, 2029: 6.500%.<br>9.   From and including July 31, 2029 to but excluding July 31, 2040: 6.900%. |  |  |
| New PDI 2030 Bonds | 0% | July 31, 2030 | Principal on the New PDI 2030 Bonds will be repaid in U.S. dollars in ten equal semi-annual installments starting on January 31, 2026 through maturity. |

45.     By contrast, non-tendering bondholders will receive much less value.  If the tender is approved, the bonds currently held by non-tendering bondholders will be modified such that their economic terms mirror those of the New 2040 Bonds.  This is a critical difference.  Bonds that mature in earlier years have a greater net present value than bonds that mature in later years.  As a result, given the differences in the maturity dates of the bonds they receive, as well as the interest rates associated with those bonds, bondholders who tender will receive significantly more value than bondholders who do not.  In present value terms, tendering bondholders will receive 58.3 cents on the dollar, whereas bondholders who do not tender will receive only 47.4 cents on the dollar.  Factoring out the value associated with the New PDI 2030 Bond that tendering bondholders receive (which is equivalent to the present value of roughly 2.3 cents on the dollar), tendering bondholders will receive a present value of 8.6 cents less on the dollar than bondholders who do not tender.  In total, this amounts to approximately a 20% penalty for bondholders who do not tender.  This differential treatment constitutes another flagrant violation of the No Less Favorable Treatment Provision.[13]

---

[13] This valuation reflects the present value associated with discounting future cash flows back to July 31, 2020 using a 10% discount rate, and assuming payments are made on the 1st of each month they are due.

46.     The modifications set forth in the Invitation Memorandum also seek to remove certain creditor protections from the original Eligible Bonds, including reduction of the threshold needed to give effect to a Non-Reserved Matter Modification under applicable indentures from at least 66⅔% to more than 50% of the aggregate principal amount of the applicable Series of Eligible Bonds; elimination of Section 7.4 of the Indenture for the 2024 Bonds and Section 7.6 of the Indenture for the Aggregated Eligible Bonds, which provide for limitations on reopening and new issuance of notes; exclusion from the events of default cross defaults arising from the entering or issuance of judgments and arbitral awards relating to (1) any Eligible Bonds that are not modified by the Proposed Modifications, (2) any Modified Eligible Bonds, (3) any New Securities, (4) the 7.25% Social Housing Notes due 2035 (the "Social Housing Notes") issued by the Republic, and (5) the 4.625% Notes due 2021 ("PAM Notes") issued by La Empresa Pública de Exploración, and; elimination of the requirement that events of default (other than the non-payment of principal that became due solely as a result of such acceleration) have been cured or waived by the holders of not less than a majority of the principal amount of the outstanding notes or remedied.  Crucially, the Proposal also seeks to eliminate the No Less Favorable Treatment Provision, which limits Reserved Matter Modifications in the context of exchange offers and issuances of new notes through consent solicitations.

Ecuador Has Stated Unequivocally That It Does Not Intend To Pay Non-Tendering Bondholders

47.     Ecuador has stated unequivocally in its Invitation Memorandum relating to the Proposal that in the event a tender for one or more series of bonds is unsuccessful, it does not intend to pay anything to non-tendering bondholders.  The Invitation Memorandum lists as its first risk factor the "***Risks of Not Participating in the Invitation***."  In plain, clear, and simple language,

---

The present value of future cash flows was then divided by the principal amount outstanding on existing bonds to calculate the % of par or face value.

this risk factor lays bare the true intent of the Republic: "*The Eligible Bonds may enter into default. If the Eligible Bonds are not tendered in the Invitation and do in fact enter into default, they may remain in default indefinitely and, if you elect to litigate, the Republic intends to oppose such attempts to collect on its defaulted debt.*"  (Ex. 2, at 20.)  In plain language, the coercive nature of the tender was revealed.

<u>The Committee Informs The Republic Of Its Objections To The Coercive Tender Offer</u>

48.     On July 22, 2020, counsel for the Committee wrote to counsel for the Republic explaining the Committee's objections to the tender offer, its violation of the No Less Favorable Treatment Provision, its coercive nature, and the misrepresentations about the transparency of the process.[14]

49.     On July 24, 2020, counsel for the Republic responded to the Committee's letter explaining Ecuador's position, and disputing the merits of the Committee's position.[15]

<u>Ecuador's July 27, 2020 Press Release</u>

50.     On July 27, 2020, Ecuador, in order to put further pressure on undecided and non-tendering bondholders, issued a false and misleading Press Release intending to promote the tender offer that flatly denied its patently obvious coercive nature.  Ecuador's misrepresentations about the coercive nature of the tender offer were highly public and are material to investors.  As explained below, the Press Release made numerous false and misleading statements about the tender offer that also contradicted statements made by the Republic in its Invitation Memorandum.

---

[14] A true and correct copy of a letter from C. Clark to E. Koster, dated July 22, 2020 is attached as <u>Exhibit 6</u>.

[15] A true and correct copy of a letter from D. Tracey to C. Clark dated July 24, 2020 is attached as <u>Exhibit 7</u>.

51.     The Press Release falsely stated that "*The Republic's focus is on . . . seeking a fair outcome for the bondholders through a process that is open to all bondholders and which fundamentally applies principles of inter-creditor equity.  The Republic is committed to a . . . transparent process.*"  (Ex. 1.)

52.     In truth and in fact, for the reasons set forth above, the Republic was not focused on a "fair outcome for the bondholders" and "principles of inter-creditor equity."  Instead, as the Republic well knew, the Republic was in reality treating non-tendering bondholders *unfairly* by giving them substantially less consideration than their tendering counterparts in violation of the No Less Favorable Treatment Provisions in the bonds.  Indeed, the provisions of the Invitation Memorandum provide ample evidence of that unfairness.

53.     The Press Release falsely stated that "*Ecuador is acting within the four corners of our indenture, including modification provisions available upon obtaining the requisite consent from bondholders.*"  (*Id*.)

54.     Ecuador has wrongly claimed that the tender offer is proper and compliant with the indentures governing its outstanding bonds.  As explained above and as Ecuador well knew, even a cursory review of the bondholders' indentures clearly reveals the Proposal would be an intentional breach of the No Less Favorable Treatment Provisions in those agreements.

55.     The Press Release made false claims about the complete lack of coercion of the tender.  Specifically, the Press Release stated that "*The [Steering Committee] asserted that the Republic negotiated with them in bad faith and characterized the process as 'coercive.'  Nothing could be further from the truth.*"  (*Id.*)

56.     As explained above, the consent and tender offer is, in fact, plainly coercive.  As the Republic well knew, by its actions, it was seeking to coerce non-tendering bondholders with

the threat of unequal and much less favorable consideration.  Further, the Republic has threatened to not make any further payments on the Eligible Bonds – should all or part of the tender be blocked – which could not be anything but coercive.  The fact that the Republic seeks to modify the No Less Favorable Treatment Provision pursuant to this transaction – a provision that seeks to prohibit coercion – stands as direct evidence of the coercive nature of the offer.  Finally, the entire process and time-line of the tender offer – a ten-day period for bondholders to take-it or leave-it or else – is by its very nature highly coercive.  To even suggest otherwise – let alone deny it emphatically as the Republic did in the Press Release – is not only false, but outrageous.

57.     The Press Release falsely stated that "*During the month of June, the Republic formally approached the Minority Committee and attempted to engage in confidential negotiations, but the advisor to the Minority Committee spent two weeks negotiating the wording of Non-Disclosure Agreements . . . .*"  (*Id.*)

58.     In truth and in fact, the Committee attempted to engage with the Republic, but was rebuffed.  As the Republic well knew, the Committee did not spend two weeks negotiating non-disclosure agreements.  What in reality occurred, and is a material fact omitted by the Republic, is that the Republic and its advisors explored and agreed to other terms with the Ad Hoc Group whereby the Ad Hoc Group and its members would support the coercive tender offer.  Whether the Ad Hoc Group or its members received any additional consideration for their support is not stated.

59.     The Press Release also falsely stated that the Republic was not seeking "*to compel the consent of the investor*" and made misleading statements that *"[t]he payment of a consent fee in the form of the PDI 2030 Bonds provides a financial incentive for holder to provide their consent*

to the amendments and accept the terms of the restructuring.  There is nothing improper or unusual in the payment of a consent fee." (*Id.*)

60.     In truth and in fact, as the Republic well knew, the "consent fee" is not a consent fee; but rather it is a disparate and discriminatory payment of past due interest to tendering bondholders that the Republic refuses to provide on equal terms to non-tendering bondholders. Further, the Press Release is misleading for the added reason that it omits any reference to the No Less Favorable Treatment Provisions which are being violated by the Republic.

61.     The Press Release also falsely and misleadingly disparages the arguments advanced by the Committee stating, irresponsibly and without any support, that the Committee has "*no basis to argue that they are being treated in an unequal manner*." (*Id.*)

62.     In truth and in fact, as explained above, the Republic well knew that the tender offer violates the No Less Favorable Treatment Provision, as explained by counsel for the Committee in its July 22 letter.  Far from there being "no basis," the Committee and Plaintiffs have ample basis to assert they are being treated in an unequal manner.

63.     Further, the Press Release undermines the statements made by the Republic in its Invitation Memorandum and is contrary to the express risk factors stated therein including the following: "*Certain creditors of the Republic may attempt to challenge the progress or consummation of the Invitation or may attempt to attach assets in connection with the Invitation, which may result in the delay or termination of the Invitation if litigation frustrates its purpose.*" (*Id.*)

64.     In fact, rather than disparage positions of the Committee as having "*no basis,*" the Invitation Memorandum acknowledges the potential risk of litigation and the uncertainty of outcomes, and states in more measured and balanced terms: "*The Republic may be subject to efforts*

*by certain creditors to enjoin or otherwise prevent the consummation of the Invitation or to attach assets in connection with the Invitation, and the Republic may delay or terminate the Invitation if litigation frustrates its purpose. While the Republic intends to vigorously oppose any such litigation efforts, the Republic cannot assure you of its success.*"  (Ex. 2, at 24.)

65.     Moreover, the Invitation Memorandum also acknowledged that recent federal court decisions cast some uncertainty with regard to the tender offer: "*Certain federal court decisions in the United States create uncertainty regarding the meaning of ranking provisions and could potentially reduce or hinder the ability of sovereign issuers to restructure their public sector debt.*" (*Id.* at 26.)

Additional Allegations Supporting Scienter

66.     As demonstrated above, at all relevant times, Defendant knew but failed to disclose and/or recklessly disregarded that the statements referenced *supra* were materially false and/or misleading and/or omitted material information that Defendant knew or recklessly disregarded was necessary to make such statements not materially false and/or misleading, for the reasons stated *supra*.  Such statements were also known by Defendant to be materially false and/or misleading at the time they were made, for the reasons outlined above, and for the following reasons, among others.

Economic Loss

67.     Here, there can be no doubt that the Defendant's fraud already has caused loss, and will cause loss, to the Plaintiffs and the class of bondholders they represent.  As to the former, bondholders who have tendered because of the Defendant's fraud already have incurred damages, in the form of reduced principal, reduced interest, and bonds otherwise devalued because of fraud. As to the latter, bondholders who will tender, as Plaintiffs will absent judicial intervention, will

incur damages, in the form of reduced principal, reduced interest, and bonds otherwise devalued because of fraud.

68.     Because Plaintiffs represent the class of bondholders who have been fraudulently induced to tender, as well as those who will be coerced into tendering absent judicial intervention, Plaintiffs will succeed in proving loss causation.  *See also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (stating that "the loss causation requirement will be satisfied if [Defendants' deceptive or manipulative] conduct had the effect of concealing the circumstances that bore on the ultimate loss.").  Plaintiffs will therefore succeed on the merits of the loss causation element.

Class Action Allegations

69.     Plaintiffs bring this action as a Class Action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(1), (2), and (3) on behalf of all members of the proposed class of similarly situated bondholders.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the provisions.

70.     The Class consists of all holders of Eligible Bonds and their predecessors, heirs, successors, assigns, or representatives who tendered or refused to tender Eligible Bonds as a part of the Proposal (the "Class").

71.     Excluded from the Class is Defendant, any affiliates of Defendant, or any entity in which any excluded person or entity has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person or entity.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds

of thousands of members in the proposed Class.  Record owners and the other members of the Class may be identified from records maintained by the Republic and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

73.   Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.

74.   Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by the Republic's acts and omissions as alleged herein;

b.   Whether the Republic participated in and pursued the common course of conduct complained of herein;

c.   Whether documents, press releases, and other statements disseminated to the Republic's bondholders misrepresented material facts about the Consent Solicitation; and

d.   The extent to which the members of the Class will be damaged and the proper measure of damages.

75.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

Applicability of the Presumption of Reliance

76.     Through its material false and misleading statements to bondholders at large, Defendant has committed a fraud on the market.  In precisely this context, the Supreme Court has recognized that bondholders may satisfy the element of detrimental reliance through the fraud-on-the-market presumption.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).  Plaintiffs and the Class are entitled to a presumption of reliance and a fraud-on-the-market presumption because during the Class Period, the market for Eligible Bonds was an efficient market for the following reasons, among others:

a.     The Eligible Bonds met the requirements for listing, and were listed and actively traded on the Luxembourg Stock Exchange, a highly efficient market;

b.     The Eligible Bonds were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

c.     The Republic issued press releases which were carried by national and international newswires.  Each of these releases was publicly available and entered the public marketplace.

77.     As a result of the foregoing, the market for Eligible Bonds promptly digested current information regarding the Eligible Bonds from all publicly available sources and reflected

such information in the price of the Eligible Bonds.  Accordingly, Plaintiffs and other members of

the Class relied, and are entitled to have relied, upon the integrity of the market for the Eligible

Bonds, and are entitled to a presumption of reliance on Defendant's' materially false and

misleading statements and omissions during the Class Period.

78.     Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated

Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

Defendant are predicated upon omissions of material fact for which there was a duty to disclose.

Defendant had no duty to make the statements contained in the July 27, 2020 Press Release.  But

when it chose to speak, it undertook a duty to speak truthfully and absent material omission.

Because Defendant chose to speak about the terms and process related to its tender offer, and did

so in a false and misleading way, it also had a duty to correct its misstatements and disclose any

additional facts necessary to make its statements not misleading.

No Safe Harbor

79.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

Defendant is liable for those false forward-looking statements because at the time each of those

forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was false and/or the forward-looking statement was authorized and/or approved by an officer of Ecuador who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)

80.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 79 as set forth herein.

81.     Defendant made false and/or misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading with respect to the Proposal, as set forth above.

82.     Plaintiffs will suffer irreparable injury from Defendant's violations of the federal securities laws described herein, and unless Defendant is enjoined from soliciting, promoting, or implementing the tender offer, corrective disclosures ordered, and future violations of the federal securities laws enjoined, Plaintiffs and other bondholders will suffer irreparable harm.

83.     By reason of the foregoing, Defendant has violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

84.     As a result of the false and/or misleading statements and/or omissions of material facts in the Press Release (and the anticipated false and/or misleading statements and/or omissions of material facts in future press releases and public filings in connection with the Proposal), injunctive relief is appropriate.

85.     Further, based on the statements in the Press Release that Defendant intends to consummate the tender offer, unless the Court specifically enjoins Defendant from doing so, Plaintiffs will suffer irreparable harm, and will have no choice but to cave to the Republic's coercive demands and tender their Eligible Bonds under duress on July 31, 2020.

86.     As a result of Defendant's violations of the federal securities laws described herein, Plaintiffs will suffer money damages and other tangible harm unless Defendant is enjoined from soliciting, promoting, or implementing the tender offer; enjoined from future violations of the federal securities laws; and ordered to issue corrective disclosures.

87.     Sufficiently serious questions going to the merits of Plaintiffs' claims make them fair ground for litigation.

88.     The balance of the equities tips toward the issuance of an injunction, and is in the interest of the public.

**WHEREFORE**, Plaintiffs respectfully request that the Court issue a judgment against the Republic of Ecuador as follows:

a.      preliminarily enjoining The Republic of Ecuador, and any of its affiliates or others acting in concert with it, from proceeding with the transactions announced on July 20, 2020, or any parts thereof, and

b.      ordering the Republic of Ecuador to (a) toll the expiration date for the transactions announced on July 20, 2020, which date is currently set for July 31, 2020 at 5:00 p.m. CET, for a period of time equal to the period of time between the signing of the order to show cause and the hearing for a temporary restraining order, and (b) enable bondholders who have already tendered Eligible Bonds to promptly withdraw their consents and tender orders unconditionally; and,

c.      granting such further relief that the Court deems just and proper.

Dated: July 29, 2020
      Greenwich, Connecticut

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ Christopher J. Clark
      Christopher J. Clark

885 Third Avenue
New York, New York  10022
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: chris.clark@lw.com

*Attorney for Plaintiffs Contrarian Emerging Markets, L.P., GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund*

# CERTIFICATION

I, Jennifer Diagonale, as General Counsel and Chief Compliance Officer to Contrarian Capital Management, LLC, which manages and advises Plaintiff Contrarian Emerging Markets, L.P. ("Contrarian") hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Contrarian.  I have reviewed the Complaint prepared against The Republic of Ecuador ("Ecuador") alleging violations of the federal securities laws;

2.     Contrarian did not purchase securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Contrarian is willing to serve as lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     Contrarian has purchased hundreds of millions in Eligible Bonds during the Class Period.

5.     Contrarian is not serving as lead plaintiff in another class action under the federal securities laws filed during the last three years.

6.     Beyond its pro rata share of any recovery, Contrarian will not accept payment for serving as lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct on this 29th day of

July, 2020.

                                       Jennifer Diagonale as
General Counsel and Chief Compliance
Officer of Contrarian Capital Management,
L.L.C. *on behalf of* Plaintiff Contrarian
Emerging Markets, L.P.

## CERTIFICATION

I, Kevin O'Brien of Grantham, Mayo, Van Otterloo & Co. LLC ("GMO"), which manages and advises Plaintiffs GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund, a sub-fund of GMO Investments ICAV (collectively the "GMO Funds") hereby certify as follows:

1.       I am fully authorized to enter into and execute this Certification on behalf of the GMO Funds. I have reviewed the Complaint prepared against The Republic of Ecuador ("Ecuador") alleging violations of the federal securities laws;

2.       The GMO Funds did not purchase securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       The GMO Funds are willing to serve as lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.       The GMO Funds have purchased hundreds of millions in Eligible Bonds during the Class Period.

5.       The GMO Funds are not serving as lead plaintiff in another class action under the federal securities laws filed during the last three years.

6.       Beyond its pro rata share of any recovery, the GMO Funds will not accept payment for serving as lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct on this 29th day of

July, 2020.

Kevin O'Brien
General Counsel for Grantham, Mayo, Van
Otterloo & Co. LLC, *on behalf of* Plaintiffs
the GMO Funds