# EXHIBIT 6

**Christopher J. Clark**
Direct Dial: +1.212.906.1200
chris.clark@lw.com

53rd at Third
885 Third Avenue
New York, New York  10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

July 22, 2020

**Sent Via Email**

Evan Koster
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
evan.koster@hoganlovells.com

Re: Response to the Republic of Ecuador's Consent Solicitation and Invitation to Exchange

Dear Mr. Koster,

We write as counsel to the Steering Committee (the "Committee") for a group of more than 25 global institutional investors (the "Group") whose members hold many hundreds of millions of dollars of "Aggregated Eligible Bonds" and "2024 Bonds" issued by your client, the Republic of Ecuador ("Ecuador" or "the Republic").[1]  We were shocked and disappointed by the press release distributed yesterday announcing Ecuador's coercive Consent Solicitation and Invitation to Exchange (the "Proposal") detailed in a so-called "Invitation Memorandum."

Contrary to the representations made in the Republic's self-serving press release to the effect that "Ecuador engaged in good faith with its bondholders, providing information with transparency," Ecuador's actions with relation to the Invitation Memorandum and the Committee have been in bad faith and have been duplicitous.  While the Committee has been prepared to engage in good faith negotiations and indeed remains committed to doing so, the Republic has never meaningfully engaged in any way with the Committee, indeed going so far as to ask the Committee to enter into Non-Disclosure Agreements and then cutting off all substantive discussion.  The Proposal has launched a coercive and ultimately self-destructive process that will have potentially far-reaching consequences for the Republic and the sovereign debt markets at large unless the Republic reverses course and agrees to an orderly restructuring that is fair and acceptable to all creditors.

As a matter of process, the manner and timing of the Proposal could hardly have been more coercive.  By its terms, the Proposal "will expire at 5:00 p.m. (Central European time) on July 31,

---

[1] The Committee is comprised of Amundi (UK) Limited, Contrarian Capital Management LLC, Grantham Mayo Van Otterloo & Co., and T Rowe Price Associates, Inc.  In addition to the Committee, the Group includes a growing number of leading global asset managers.  As a whole, the Group owns bonds issued by Ecuador across the maturity spectrum with holdings in excess of 25% and more than 35% in certain series of Bonds.

LATHAM&WATKINS LLP

2020" unless extended or earlier terminated by the Republic – a mere ten days after the Invitation Memorandum was released. After many months of waiting for a proposal from the Republic, or even, indeed, a conversation concerning a proposal, the compressed time frame can only be seen as a bad faith gambit to coerce holders. Rather than allow for a reasonable time for the Committee and other bondholders to consider the Proposal and work constructively with the Republic toward a resolution, the Republic has sought to use high pressure tactics to force an unfavorable deal upon investors.

The Proposal improperly seeks to compel the consent of investors by putting non-tendering bondholders in a highly disadvantaged position, which includes forfeiting their right to both receive the new zero-coupon bond due in 2030 (the "PDI 2030 Bonds") and to receive accrued and unpaid interest on the Modified Eligible Bonds. (*See* Invitation Memorandum at 21.) Moreover, even bondholders who tender after the unreasonable consent deadline will forfeit their right to receive the PDI 2030 Bonds or any payments in respect of accrued and unpaid interest. (*See id.* at ii.) Ecuador has insisted that bondholders decide within a timeframe of only ten days whether to accept this exchange offer, lest they risk further losses in the form of accrued and unpaid interest. Furthermore, Ecuador has sprung this expedited decision upon investors after depriving them of the fair and transparent negotiation process they sought leading up to the launch of the consent solicitation.

Our emphatic objection to the Invitation is based on the Committee's belief that the Proposal presents a harmful precedent for emerging markets restructurings generally that would allow sovereigns to renege on binding provisions in indentures. It is axiomatic that one of the core and bedrock principles of the sovereign debt markets is that investors will receive the benefit of their bargain when purchasing the debt instruments of a sovereign nation. Here, as explained more fully below, the bondholders negotiated for, and received, specific assurances in writing from Ecuador that they would not be disadvantaged or treated less favorably than other bondholders in the event that Ecuador sought to modify the bonds. The Republic's actions in the Proposal run roughshod over these tenets. In plain violation of the terms of the indentures of the Aggregated Eligible Bonds that the members of the Committee (and indeed all bondholders) negotiated for in good faith – and that the Republic agreed to – the Republic has elected not to give equal terms to the bondholders who choose to opt out of this one-sided and highly disadvantageous exchange offer.

In addition to the high pressure tactics by which the Republic seeks to force this proposal upon investors, those investors who elect not to consent to the harshly unfavorable terms of the Proposal will not receive equivalent treatment to the consenting bondholders (assuming that the Proposal is successful and achieves the 80 percent Minimum Participation Condition and all other relevant conditions under the Eligible Bonds). Instead, non-tendering bondholders will receive a less favorable rate on the Modified Eligible Bonds, at a value of 91.13 cents on the dollar compared to the unmodified bonds. (*Id*. at 50.) Non-tendering bondholders will also lose out on all accrued and unpaid interest on the notes, and will not receive the PDI 2030 Bonds. (*Id*. at iii-iv.)

Such prejudicial treatment of non-tendering bondholders violates the provisions of the indentures of the Eligible Bonds, which require that any modified notes issued by the Republic are no less favorable than the terms of any new notes being offered in the exchange:

July 22, 2020
Page 3

**LATHAM&WATKINS**LLP

> If any Reserved Matter Modification . . . is sought in the context of a simultaneous offer to exchange the Notes for new debt instruments of the Republic or any other Person, the Republic shall ensure that the relevant provisions of the Notes, as amended by such Modification, ***are no less favorable to the Holders thereof than the provisions of the new instrument being offered in the exchange, or if more than one debt instrument is offered, no less favorable than the new debt instrument issued having the largest aggregate principal amount.*** (*See, e.g.*, Indenture for 7.95% Bonds due 2024, § 7.3.)

This language plainly forecloses the inferior treatment that the Republic seeks to impose upon the non-tendering bondholders, as compared to those who consent to the exchange. The exchange offer seeks to effect unfavorable modifications to the Eligible Bonds, while those bondholders who do not tender – or who tender after the unreasonably expedited Consent Deadline – are also deprived of the benefit of the PDI 2030 Bonds. Such treatment is not permitted under the agreements, and it threatens to lead to years of ruinous litigation with the non-tendering bondholders.

The Steering Committee understands that the Republic may take the baseless position that the protections to which creditors are entitled under this provision may be removed by exit consent. That position has no merit. The Republic's Proposal is specifically prohibited by the language of the Indentures and is a breach thereof. What the Republic attempts to style as a modification, is in fact an actionable breach of the existing agreement between the Republic and the bondholders. The Republic cannot, by subsequent agreement, modify the terms of the existing Indentures in a way that is prohibited by those Indentures. Furthermore, the Republic may not use coercive debt exchange practices that are prohibited under the Indentures to modify the bond terms so as to write out the very same protections that prohibit such practices.

The Proposed Modifications to the Eligible Bonds also contain other harmful provisions. These include, but are not limited to: reducing the single-series threshold required to give effect to a Non-Reserved Matter Modification from 66 ⅔% to 50%, which would in effect lower the threshold for enacting other creditor-unfriendly measures; removing provisions of the indentures limiting the ability of the Republic to engage in future modifications and issuances of new notes; and excluding defaults arising from any unmodified Eligible bonds, Modified Eligible Bonds, and any New Securities from the events of default that may give rise to a cross default. (*Id.* at 50-51.) In short, Ecuador's Proposal would eviscerate the covenants that were bargained-for to protect the bondholders who agreed in good faith to invest in these securities.

For all of these reasons, the Proposal is not an offer that any of the Republic's investors should be inclined to accept. Rather than extend an invitation, the Republic has issued an ultimatum. It seeks to impose a coercive and unequitable restructuring process upon investors holding hundreds of millions of dollars' worth of bonds of the Republic as a *fait accompli* that the Republic hopes investors will have no choice but to accept.

LATHAM&WATKINS<sup>LLP</sup>

      Fortunately, this is not yet the case. The Republic may still reverse its course and achieve an orderly debt restructuring through a fair and transparent process. The Committee remains willing to engage in a constructive dialogue with the Republic, in the shared interest of achieving a fair and equitable restructuring for all parties.

      Sincerely,

      /s/ Christopher J. Clark

      Christopher J. Clark