**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONTRARIAN EMERGING MARKETS, L.P., GMO EMERGING COUNTRY DEBT FUND, GMO EMERGING COUNTRY DEBT INVESTMENT FUND PLC, and GMO EMERGING COUNTRY DEBT (UCITS) FUND, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> -against- <br><br> THE REPUBLIC OF ECUADOR, <br><br> Defendant. | 20 Civ. 5890 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................1

I.    STATEMENT OF RELEVANT FACTS ............................................................................4

    A.    The Background of the Proposed Transaction ........................................................4

        1.    Ecuador's History of Debt Defaults................................................4
        2.    Recent Financial Troubles ..............................................................5
        3.    Attempts to Negotiate .....................................................................6

    B.    Ecuador Announces a Coercive Tender Offer ........................................................6

    C.    The Steering Committee Letter to Ecuador ............................................................9

    D.    Ecuador Disseminated a Materially Misleading and Incomplete Public Statement in Connection with Its Tender Offer ...................................................9

II.    ARGUMENT .......................................................................................................................11

    A.    Legal Standard ......................................................................................................11

    B.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief........................12

    C.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendant Committed Securities Fraud in Violation of Section 10(b) of the Exchange Act ...................................................................................................14

        1.    Defendant Made Material Misrepresentations and Omissions in Connection with the Purchase or Sale of a Security ..........................................................................................15
        2.    Defendant Knew That Its Statements Were Materially Misleading When Made....................................................................18
        3.    Plaintiffs and the Class Relied on Defendant's Material Misstatements and Omissions.....................................................19
        4.    Absent Injunctive Relief, Defendant's Material Misstatements and Omissions Will Cause Plaintiffs' Loss ...........20

    D.    Preliminary Injunctive Relief to Plaintiffs Favors the Public Interest..................21

    E.    The Balance of Equities Tips in Favor of Granting Preliminary Injunctive Relief to Plaintiffs ................................................................................................21

CONCLUSION................................................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
No. 09 Civ. 8862 (GBD), 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) .........................18, 19

*Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.*,
876 F. Supp. 482 (S.D.N.Y. 1994).......................................................................................14

*Am. Insured Mortg. Inv'rs v. CRI, Inc.*,
No. 90 Civ. 6630 (MBM), 1990 WL 192561 (S.D.N.Y. Nov. 26, 1990)...............................12

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
2 F. Supp. 3d 550 (S.D.N.Y. 2014)......................................................................................15

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
813 F.3d 98 (2d Cir. 2016)...................................................................................................19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................19

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001).................................................................................................20

*Citibank N.A. v. K-H Corp.*,
968 F.2d 1489 (2d Cir. 1992)...............................................................................................20

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)...................................................................................................11

*In re Citigroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)..................................................................................18

*Clemente Glob. Growth Fund, Inc. v. Pickens*,
705 F. Supp. 958 (S.D.N.Y. 1989).......................................................................................21

*Crede CG III, Ltd. v. 22nd Century Grp., Inc.*,
No. 16 Civ. 3103 (KPF), 2019 WL 652592 (S.D.N.Y. Feb. 15, 2019) ..................................17

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).................................................................................................19

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..............................................................................................................18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009).................................................................................................12

ii

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................18

*Greenlight Capital, L.P. v. Apple, Inc.*,
    No. 13 Civ. 900 (RJS), 2013 WL 646547 (S.D.N.Y. Feb. 22, 2013).....................14

*Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.*,
    476 F.2d 687 (2d Cir. 1973).................................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).............................................................................................15

*Kane v. N.Y. State Nurses Ass'n*,
    No. 11 Civ. 6505 (RJS), 2011 WL 4862924 (S.D.N.Y. Oct. 13, 2011) ...............11

*Lerner v. Fleet Bank. N.A.*,
    459 F.3d 273 (2d Cir. 2006).................................................................................18

*In re MF Glob. Inc.*,
    496 B.R. 315 (S.D.N.Y. 2013)..............................................................................17

*Morrison v. National Australia Bank*,
    561 U.S. 247 (2010).............................................................................................15

*NML Capital, Ltd. v. Republic of Argentina*,
    144 F. Supp. 3d 513 (S.D.N.Y. 2015), *aff'd in part*, 699 F.3d 246 (2d Cir.
    2012) ....................................................................................................................13

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)...................................................................20

*Perrigo Co. PLC v. Mylan N.V.*,
    No. 15 Civ. 7341 (NRB), 2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015) ...............12

*Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001)...................................................................21

*R Squared Glob. v. Serendipity 3, Inc.*,
    No. 11 Civ. 7155 (PKC), 2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011)..................22

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992).............................................................................................19

*Republic of Philippines v. Marcos*,
    806 F.2d 344 (2d Cir. 1986).................................................................................14

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)...................................................................................21

*Secured Worldwide LLC v. Kinney*,
　No. 15 Civ. 1761 CM, 2015 WL 1514738 (S.D.N.Y. Apr. 1, 2015)......................................21

*Silberstein v. Aetna, Inc.*,
　No. 13 Civ. 8759 (AJN), 2014 WL 1388790 (S.D.N.Y. Apr. 9, 2014)..............................2, 12

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*,
　483 F.2d 247 (2d Cir. 1973)....................................................................................12, 21

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
　250 F.3d 87 (2d Cir. 2001)................................................................................................20

*United States v. Vilar*,
　729 F.3d 62 (2d Cir. 2013)................................................................................................15

## STATUTES

15 U.S.C.
　§ 78j(b).......................................................................................................14, 15, 19
　§ 78n(a)-(c) .........................................................................................................................1

28 U.S.C. § 1605(a)(2)..........................................................................................................19

## REGULATIONS

17 C.F.R. § 240.10b-5.......................................................................................................14, 15

## OTHER AUTHORITIES

*Jill Concannon et al.*, *Introduction to Debt Exchange Offers*, WHITE & CASE
　(Dec. 7, 2017), available at: https://www.whitecase.com/publications/alert/
　introduction-debt-exchange-offers.............................................................................................1

## PRELIMINARY STATEMENT

The Republic of Ecuador ("Ecuador" or the "Republic") is committing securities fraud this week in this District. Right now, Ecuador is asking existing bondholders to participate in a bond exchange, which is essentially a tender offer, to help the country restructure $17.4 billion of its debt. But the tender offer is fatally tainted by material misstatements and omissions that Ecuador has made, particularly in a public statement just days ago.[1] The tender offer is imminently set to expire on **Friday, July 31, 2020 at 12:00 p.m. Eastern Standard Time (EST)**.[2] Plaintiffs are founding members of a Steering Committee for a group of more than 25 global institutional investors who hold at least hundreds of millions of dollars of Ecuador's bonds.[3] Plaintiffs now bring this action individually and on behalf of all bondholders similarly situated, including certain other members of the Steering Committee, to obtain the same emergency relief that courts in this District have regularly granted in these circumstances—the relief that courts have described as "the only effective remedy" here—an injunction to immediately pause Ecuador's misleadingly marketed tender. Absent judicial intervention, Plaintiffs and others similarly situated will suffer

---

[1] While consent tender offers of bonds by sovereign governments are arguably not subject to the tender offer rules of Section 14 of the Exchange Act of 1934, the offer at issue here is, for all practicable purposes, a tender offer, and will therefore be referred to as a tender offer in this Motion. *See* Jill Concannon *et al.*, *Introduction to Debt Exchange Offers*, WHITE & CASE (Dec. 7, 2017), available at: https://www.whitecase.com/publications/alert/introduction-debt-exchange-offers.

[2] The Invitation Memorandum states that the exchange deadline is Friday, July 31, 2020 at 5:00 p.m. Central European Time, which is equivalent to Friday, July 31, 2020 at 12:00 p.m. EST.

[3] Plaintiff Contrarian Emerging Markets, L.P. is managed by Contrarian Capital Management, LLC (collectively "Contrarian"). Plaintiffs GMO Emerging Country Debt Fund, a series of GMO Trust, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund, a sub-fund of GMO Investments ICAV (collectively the "GMO Funds") are managed by Grantham, Mayo, Van Otterloo & Co. As a whole, the GMO Funds own bonds issued by Ecuador across the maturity spectrum with holdings in excess of 25% of all series that are subject to the Proposal, and more than 35% in certain series of bonds. *See, e.g.*, Declaration of Michael E. Ginnings, filed herewith ("Ginnings Decl.").

irreparable harm.  That harm cannot be redressed after the tender is consummated because, by that point, it will be "virtually impossible for a court to unscramble the eggs." *Silberstein v. Aetna, Inc.*, No. 13 Civ. 8759 (AJN), 2014 WL 1388790, at *3 (S.D.N.Y. Apr. 9, 2014) (citation omitted).

Ecuador has made three categories of material misstatements and omissions in connection with the tender offer.  First, Ecuador has claimed that there is nothing "coercive" about the scheme. That is simply false.  The tender was clearly designed to coerce bondholders into agreeing to the Proposal.  If minimum participation requirements are met, non-tendering bondholders will still be subject to the tender, but will be punished for having failed to agree to the tender at the outset. They will receive significantly less valuable bonds than tendering bondholders (estimated to be a present value of 8.6 cents less on the dollar and, in total, what amounts to approximately a 20% penalty); they will forfeit any right to accrued and unpaid cash interest; and they will be forced to give up significant non-monetary rights and protections, such as the right to receive terms no less favorable than terms provided to other bondholders in any future restructuring.  The tender is also coercive in that it gives bondholders less than two weeks to make a decision, which is plainly insufficient for matters of such consequence.  Ecuador's misrepresentations about the coercive nature of the tender offer have been highly public and are material to investors.

Second, Ecuador has publicly touted to investors that it has engaged in a transparent process leading up to the tender offer.  Not so.  In recent months, Ecuador refused to meaningfully engage with the Steering Committee about a mutually beneficial transaction, even though the Steering Committee holds a significant portion of the nation's outstanding bonds—a fact that clearly would be relevant to the market.  Further, contrary to its claims of being transparent, Ecuador not only resisted constructive discussion with the Steering Committee, but failed to give bondholders anything approaching adequate time, let alone notice, in connection with the tender.

And Ecuador even recently rejected the Steering Committee's reasonable and good-faith request for a 30-day postponement for Ecuador to correct the abuses and fraud associated with the tender process, and to pursue a resolution, if possible.  Nothing compelled Ecuador to misrepresent the process by which the tender was negotiated, except an apparent intent to deceive investors.

Third, Ecuador has wrongly claimed that the tender is proper and compliant with the indentures governing its outstanding bonds.  In truth and in fact, the terms of the current tender offer flatly contravene clear contractual promises that Ecuador previously made to existing bondholders in its indentures.  To induce parties to invest in their bonds in the first place, Ecuador guaranteed bondholders the right, in any future restructuring, to receive terms that are "no less favorable" to bondholders than the terms associated with certain bonds held by other bondholders in the restructuring.  Far from treating non-tendering bondholders "no less favorabl[y]" than others, Ecuador here has proposed to treat them markedly worse.  And it has compounded this abuse by lying about it.

Absent immediate judicial intervention, the Plaintiffs will suffer irreparable harm if the tender goes forward and is completed.  The Plaintiffs, members of the Steering Committee, and other bondholders similarly situated, will have no choice but to tender under duress and thereby give up important, non-monetary rights.  These parties will likewise have no ability to collect on any monetary damages that may be awarded because the Defendant is admittedly insolvent, and for all intents and purposes, judgment-proof.  Accordingly, the Plaintiffs ask this Court for a temporary restraining order and preliminary injunction to, among other things, immediately prevent Ecuador from consummating its fraudulent and coercive tender offer, and permitting those bondholders who have already been tricked into the tender to withdraw their consents.

3

## I.    STATEMENT OF RELEVANT FACTS

### A.    The Background of the Proposed Transaction

#### 1.    Ecuador's History of Debt Defaults

Ecuador has a long and well-known history of defaulting on its legal obligations.  (Compl. ¶ 15.)  Since its founding, Ecuador has defaulted on its obligations, and harmed its creditors, at least eight times.  (*Id.*)  Two of the defaults came in the past twenty years or so alone.  In the wake of these recent debt defaults, Ecuador sought to stabilize its debt market.  (*Id.* ¶ 31.)  In a series of multi-billion-dollar debt offerings, Ecuador induced investors to purchase its bonds by giving them enhanced protections and reassuring them about the treatment they would receive if Ecuador was subsequently compelled to restructure its debt yet again.  (*Id.*)  Specifically, Ecuador included, in its indentures, a "No Less Favorable Treatment Provision."  (*Id.*)  That provision stated:

> If any Reserved Matter Modification[4]. . . is sought in the context of a simultaneous offer to exchange the Notes for new debt instruments of the Republic or any other person, *the Republic shall ensure that the relevant provisions of the Notes, as amended by such Modification, are no less favorable to the Holders thereof than the provisions of the new instrument being offered in the exchange*, or if more than one debt instrument is offered, no less favorable than the new debt instrument issued having the largest aggregate principal amount.

(Compl. Ex. 4 (Indenture for 2024 Bonds § 7.3) (emphasis added).)

The above provision applies to a tender situation (such as this) whereby Ecuador seeks to modify existing debt of non-participating holders—as permitted under the indenture's modification provisions (the "Collective Action Clauses").  The provision exists to protect non-

---

[4] Reserved Matter Modifications include, among other things, modifications that would change the due date for the payment of principal or interest under the Notes; reduce the amount of principal amount of the Notes; and reduce the requisite consent threshold necessary to modify the terms and conditions of the debt securities or the indentures.  Non-Reserved Matter modifications are any modifications other than those constituting a Reserved Matter.  (*See* Compl. Ex. 5 (Offering Circular for 2029 Notes at 218).)

participating investors from coercion.  In such a situation, a tendering bondholder would receive a new bond via the tender, and a non-tendering investor's existing debt would be non-consensually modified.  The No Less Favorable Treatment Provision establishes limits on that modification. Specifically, even though the non-tendering bondholder did not participate in the tender or vote in favor of the modifications that amended its debt, those modifications cannot leave the non-tendering bondholder with inferior treatment from what the tendering bondholder received.  If the tendering bondholder agreed, for example, to reduce cash interest by five percent and extend maturities by ten years, the non-tendering bondholder cannot be forced to reduce cash interest or extend maturities to a greater extent than that five percent and ten years.  In short, the non-tendering bondholder cannot be punished for exercising its right to vote against a restructuring proposal.

This No Less Favorable Treatment Provision guarantees fair treatment in the event of any subsequent restructuring.  (Compl. ¶ 31.)  It was intended to reassure investors about the soundness of investing in Ecuador's bonds.  And it worked.  Ecuador raised an impressive $17.4 billion on bonds that included the No Less Favorable Treatment Provision between 2014 and 2019.  (*Id.*) The Plaintiffs purchased at least hundreds of millions of dollars of these bonds based in part on investor protections, including the No Less Favorable Treatment Provision, included in the indentures.  (*Id.* ¶ 32; Ginnings Decl. ¶¶ 4-5.)

### 2.      Recent Financial Troubles

As a result of the financial impacts of the ongoing COVID-19 pandemic, Ecuador's financial position has grown increasingly perilous.  In March 2020, Ecuador's finance minister Richard Martinez announced that Ecuador would be unable to make approximately $200 million worth of payments on the Eligible Bonds, and in response, Ecuador and its bondholders negotiated the terms of a robust forbearance agreement, which allowed for the deferral of $811 million in interest payments until August 15, 2020, pursuant to a consent solicitation.  (Compl. ¶ 24.)

Ecuador currently faces the prospect of another debt default and now seeks U.S. $2.9 billion in external financing from the IMF, World Bank, IDB, and CAF.  (*Id.* ¶ 22.)

        **3.**        **Attempts to Negotiate**

In March and April of 2020, the Steering Committee negotiated in good faith with Ecuador, which led to the execution of a forbearance agreement deferring payments on Ecuador's debt. Shortly thereafter, the Steering Committee learned that Ecuador's financial troubles were unlikely to end, and attempted repeatedly to negotiate the terms of a fair restructuring.  Ecuador did not substantively engage with the Steering Committee and left it and other bondholders waiting for a proposal that never came.  Ecuador even went so far as to ask a group of bondholders to enter into Non-Disclosure Agreements but then cut off all substantive discussion of terms.  Compl. ¶ 58.

        **B.**        **Ecuador Announces a Coercive Tender Offer**

On July 20, 2020, Ecuador unexpectedly announced a new proposal—the Consent Solicitation and Exchange as detailed by the Invitation Memorandum ("Proposal")—and presented it to the bondholders as a fait accompli: Accept cents on the dollar for your principal investment, irrevocably forfeit your contractual right to accrued and unpaid cash interest on your existing investment, and give up a variety of other contractual protections specifically contemplated at the time of investment, or lose all.  (Compl. ¶ 5.)  By its express terms, the Consent Solicitation and Exchange treats certain existing bondholders much worse than others in what is a transparent effort to coerce bondholders into tendering and agreeing to Ecuador's terms.  (*Id.*)

Under the Proposal:  If the minimum participation requirements are met, then all holders of Eligible Bonds are forced into new terms which require, among other things, that the bondholders: (1) will receive new securities that would reduce the outstanding principal amount to $911.30 principal for every $1,000 of principal originally due; (2) will irrevocably forfeit the right to receive accrued and unpaid cash interest; and (3) forfeit the right to a variety of

contractually mandated investor protections in the indentures, including the right to be treated "no less favorabl[y] than other bondholders."  (*Id.* ¶¶ 39, 42, 44.)

The Proposal treats bondholders differently in two ways.  First, bondholders who tender before the impending deadline of July 31 will receive a separate New PDI 2030 Bond ("PDI" stands for Past Due Interest)—a new, zero-coupon security on a tendered Eligible Bond that would effectively enable the bondholder to recoup 86% of the accrued and unpaid interest they were owed.  (*Id.* ¶ 41.)  Conversely, bondholders who do not tender—or who tender after the July 31 deadline—will not receive the New PDI 2030 Bond.  (*Id.*)  In other words, far from receiving "no less favorable treatment" than other holders of the new securities, non-tendering bondholders will be punished with terms that are much worse, because non-tendering bondholders would get 0% of their accrued and unpaid cash interest, whereas tendering bondholders would receive 86%.

Second, bondholders who tender receive new bonds that are staggeringly more valuable than those received by non-tendering bondholders.  This is because tendering bondholders receive a mix of new bonds that mature in 2030, 2035, and 2040, whereas the bonds held by non-tendering bondholders will effectively be transformed only into New 2040 Bonds.  In present value terms, tendering bondholders will receive 8.6 cents on the dollar more than bondholders who do not tender. This differential treatment plainly violates another aspect of the No Less Favorable Treatment Provision.  After all, the No Less Favorable Treatment Provision expressly states that "if more than one debt instrument is offered," existing bondholders must receive terms "no less favorable than the new debt instrument issued having the largest aggregate principal amount."  (*Id.* ¶ 31.)  Here, the bond with the largest aggregate principal amount is New 2035 Bonds.  But non-tendering bondholders are given, not terms equivalent to the New 2035 Bonds, but the much less favorable terms associated with New 2040 Bonds.

Ecuador's existing indenture highlights all parties' understanding that the unfair conduct described above violates any guarantee of equal treatment among consenting and non-consenting bondholders.   In the collective action context, the indenture describes a uniformly applied restructuring that offers equal treatment throughout that provides all bondholders with the same new instrument and same terms.   The same terms are further defined to mean:

> the same offer on principal, the same offer on all interest accrued but unpaid prior to an exchange or event of default and the same offer on past due interest (or other relevant financial features of the applicable debt securities), but any such offer may contain differences as between different series of affected debt securities which are necessary having regard to the currency of denomination.

(*See, e.g.*, Compl. Ex. 5 (Offering Circular for 2029 Notes at 210.))

Reading this description of uniform treatment and same terms into the present restructuring, the unfair treatment of non-consenting bondholders becomes clearer.   Non-consenting bondholders do not receive "the same offer on all interest accrued but unpaid."   Non-consenting bondholders do not receive "the same new instrument or instruments."   And not surprisingly, non-consenting bondholders receive no certification of equal treatment from Ecuador.

Worse still, Ecuador has leveled threats against non-tendering bondholders that call into question whether Ecuador would honor *any* of its commitments to them.   Specifically, the risk factors described in the Proposal explicitly warn non-tendering bondholders:  "The Eligible Bonds may enter into default.  If the Eligible Bonds are not tendered in the Invitation and do in fact enter into default, they may remain in default indefinitely and, if you elect to litigate, Ecuador intends to oppose such attempts to collect on its defaulted debt."  (Compl. ¶ 47.)  Needless to say, no similar warning was included for tendering bondholders.

### C.      The Steering Committee Letter to Ecuador

On July 22, 2020, two days after receiving the Invitation Memorandum, counsel for a Steering Committee for certain holders of Aggregated Eligible Bonds and 2024 Bonds—a Steering Committee that includes Plaintiffs—sent a letter to Ecuador ("Steering Committee Letter"), explaining the Steering Committee's positions and asking Ecuador to reverse its course.  Among other things, the Steering Committee explained that: 1) contrary to Ecuador's claim of engaging in good faith and with "transparency," in fact, "the Republic has never meaningfully engaged in any way" with the Steering Committee and that the Steering Committee had been waiting "many months…for a proposal from the Republic, or even, indeed, a conversation concerning a proposal" prior to the unexpected and sudden announcement of a tender; 2) the new tender offer was coercive because it "seeks to compel the consent of investors by putting non-tendering bondholders in a highly disadvantaged position;" and 3) the tender offer "violates the provisions of the indentures of the Eligible Bonds," including the No Less Favorable Treatment Provision.  (*See* Compl. ¶ 48; Compl Ex. 6.)  Counsel for Ecuador responded in writing on July 24, 2020.

### D.      Ecuador Disseminated a Materially Misleading and Incomplete Public Statement in Connection with Its Tender Offer

On July 27, 2020, Ecuador released a public statement ("July 27 Public Statement") responding to "press reports" about the Steering Committee Letter.  The July 27 Public Statement was a work of fiction that materially misstates the substance of and circumstances surrounding the tender offer and conceals necessary facts that existing bondholders need in order to make an informed decision about the tender offer.  (Compl. ¶ 50.)  The misrepresentations fall into three categories.

First, the July Public Statement made materially false and misleading statements and omissions claiming that the tender offer was not coercive.  These include the following:

- "The [Steering Committee] asserted that the Republic negotiated with them in bad faith and characterized the process as 'coercive.' Nothing could be further from the truth." (*Id.* ¶ 55.) This statement is false—the Steering Committee was open and prepared to engage in good faith negotiations with Ecuador, but Ecuador never meaningfully engaged in any way with the Steering Committee, and indeed cut off all communication after asking that the Steering Committee execute Non-Disclosure Agreements.

- The tender offer, in providing PDI 2030 Bonds only to tendering bondholders is a consent fee and there is "nothing improper or unusual" about it. (*Id.* ¶ 59.) This is false because this is a violation of the No Less Favorable Treatment Provision. This statement also materially omits that the tender offer violates the agreement and fails to mention that tendering bondholders get a mix of new bonds that are significantly more valuable than those who do not tender.

- Ecuador is not seeking "to compel the consent of the investor" and made misleading statements that "[t]he payment of a consent fee in the form of the PDI 2030 Bonds provides a financial incentive for holders to provide their consent to the amendments and accept the terms of the restructuring." (*Id.*) This statement is false because Ecuador knew that the "consent fee" was a disparate and discriminatory payment of past due interest to tendering bondholders that Ecuador refused to provide on equal terms to non-tendering bondholders.

- The Steering Committee has "no basis to argue that they are being treated in an unequal manner." (*Id.* ¶ 61.) This statement is false for all of the reasons mentioned regarding Ecuador treating non-tendering and tendering bondholders differently.

- "The Republic's focus is on . . . a process that is open to all bondholders and which fundamentally applies to principles of inter-creditor equity." (*Id.* ¶ 51.) This statement is false because Ecuador was treating non-tendering bondholders differently by giving them substantially less consideration than their tendering counterparts, in violation of the No Less Favorable Treatment Provision in the bonds. In addition, the falsity of this statement is demonstrated by the fact that Ecuador did not consult with the Steering Committee in any way about its Proposal, putting the lie to a claim of an open process.

Second, the July 27 Public Statement made materially false and misleading statements and omissions that the tender offer and process were "transparent." These include the following:

- "The Republic is committed to a . . . transparent process." (*Id.*) This statement is false because Ecuador concocted its Proposal without any consultation with bondholders like the Steering Committee, in a process that was the very antithesis of transparency.

- "During the month of June, the Republic formally approached the Minority Committee and attempted to engage in confidential negotiations, but the advisor to

the Minority Committee spent two weeks negotiating the wording of Non-Disclosure Agreements . . ." (*Id*. ¶ 57.) This statement is false because the Committee did not spend two weeks negotiating non-disclosure agreements. It is also false because the Steering Committee attempted to engage with Ecuador, but was rebuffed. As recently as July 27, 2020, counsel for the Steering Committee asked Ecuador for a respite of 30 days to work toward a resolution so that Ecuador could correct the abuses in the tender offer, but Ecuador never responded.

Third, the July 27 Public Statement falsely asserts that this proposed transaction is perfectly legal and permissible under the Indenture. Specifically, Ecuador falsely claimed that it "is acting within the four corners of our indentures, including the modification provisions available upon obtaining the requisite consent from bondholders." (*Id*. ¶ 53.) As described above, the tender offer does not comply with the No Less Favorable Treatment Provision by its very terms.

## II.     ARGUMENT

### A.     Legal Standard

Before an injunction may be issued, a plaintiff must demonstrate: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; (2) that the injunction is necessary to prevent irreparable harm; and (3) that the preliminary injunction is in the interest of the public. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The "serious questions standard" permits an injunction where it may not be immediately possible to "determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* It is well-settled that "[t]he standard for a temporary restraining order is the same as for a preliminary injunction." *Kane v. N.Y. State Nurses Ass'n*, No. 11 Civ. 6505 (RJS), 2011 WL 4862924, at *2 (S.D.N.Y. Oct. 13, 2011).

### B.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).  In the context of tender offers, "when it appears likely that the offer may contain materially misleading statements or omissions as made . . . preliminary injunctive relief [is] an appropriate method of remedying the deficiencies . . . before the offer is consummated." *Perrigo Co. PLC v. Mylan N.V.*, No. 15 Civ. 7341 (NRB), 2015 WL 9916726 at *3 (S.D.N.Y. Oct. 29, 2015) (quoting *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250-51 (2d Cir. 1973)).  Further, "a preliminary injunction is generally the only effective remedy since 'once a tender offer has been consummated, it becomes difficult and sometimes virtually impossible for a court to unscramble the eggs.'"  *Silberstein*, 2014 WL 1388790, at *3 (S.D.N.Y. Apr. 9, 2014) (internal quotation marks and citation omitted); *see also Am. Insured Mortg. Inv'rs v. CRI, Inc.*, No. 90 CIV. 6630 (MBM), 1990 WL 192561, at *6 (S.D.N.Y. Nov. 26, 1990) ("Indeed, a preliminary injunction is generally the only effective remedy . . . once a tender offer has been consummated") (internal quotation marks and citation omitted).

Plaintiffs here will suffer irreparable harm in a number of ways.

*First*, Defendant's tender offer is tainted by its own material misstatements and omissions. As a result, absent an injunction, Plaintiffs will be forced to tender and exchange their bonds to avoid the economically deleterious consequences of failing to tender in a timely fashion as dictated by the coercive procedure implemented in the Proposal.  In doing so, against their will and under duress, Plaintiffs will be forced to give up critical rights including: the protections afforded by the No Less Favorable Treatment Provision, reduction of the threshold needed to give effect to a Non-Reserved Matter Modification under applicable indentures from at least 66⅔% to more than 50% of the aggregate principal amount of the applicable Series of Eligible Bonds, and certain

12

protections related to events of default.  (*See* Ginnings Decl. ¶ 17.)  Loss of these protections is non-monetary.

Second, should the tender be consummated, the Court would be required to "unscramble" a large number of eggs, which would be "virtually impossible" for the Court to do.  If the tender is approved and this Court later finds that the tender offer was issued in violation of securities laws, it will be impossible for the Court to determine which bondholders—if any—would have still tendered had the details and nature of the transaction been fully and truthfully disclosed in advance of the tender.  Relatedly, if the tender offer is allowed to proceed and Plaintiffs do not tender, their position will be subordinated to the tendering bondholders, in violation of a contractual promise, which constitutes a distinct irreparable harm.  *See, e.g.*, *NML Capital, Ltd. v. Republic of Argentina*, 144 F. Supp. 3d 513, 520 (S.D.N.Y. 2015) ("[Defendant's] violat[ion] [of] its promise to rank plaintiffs' bonds equally with its later-issued external indebtedness by making payments on the Exchange Bonds and not on plaintiffs' bonds" constituted "irreparable harm for which there is no adequate remedy at law"), *aff'd in part*, 699 F.3d 246 (2d Cir. 2012).

Finally, with regard to money damages for the harm resulting to bondholders, Plaintiffs will likely be unable to collect on any money judgment against Ecuador, given its "perilous financial state."  After all, in the very Invitation Memorandum accompanying the tender offer, Ecuador explicitly conceded that the COVID-19 pandemic "has had a *severe* impact on the Republic's economy," and has resulted in the country's need to request billions of dollars of financial support from "multilateral organizations such as the IMF, the World Bank, the IDB and the CAF."  (Compl. Ex. 2; Ginnings Decl. ¶¶ 15-16.)  Although monetary injury is not ordinarily sufficient to show irreparable harm, the Second Circuit is clear that injunctive relief is necessary "to prevent a defendant from making a judgment uncollectible," *Republic of Philippines v. Marcos*,

806 F.2d 344, 356 (2d Cir. 1986), and a finding of irreparable harm is appropriate where "it is shown that a money judgment will go unsatisfied absent equitable relief." *Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) (citations omitted).

An injunction is necessary now to prevent Plaintiffs from suffering irreparable harm.

### C.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendant Committed Securities Fraud in Violation of Section 10(b) of the Exchange Act

In addition to demonstrating that it will suffer irreparable harm, Plaintiffs, on behalf of themselves and others similarly situated, can establish a likelihood of success on the merits of its securities fraud claim under Section 10(b) of the Exchange Act.  Here, the record shows that Defendant knowingly made material and misleading statements and omissions in its July 27 Public Statement about its invitation to holders of its eligible bonds to restructure its outstanding debt. Plaintiffs are seeking this injunction because, based on these misleading statements and omissions, bondholders cannot make a fully informed decision about the tender offer before Defendant's July 31, 2020 12:00 p.m. EST deadline—a deadline that is merely days away now.  Bondholders need accurate information, not a July 27 Public Statement that both: 1) distorts and misrepresents the tender offer, and 2) induces bondholders to tender shares based on untrue statements.

Plaintiffs are likely to succeed on the merits of their securities fraud claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and—at the very least— can demonstrate a sufficiently serious question going to the merits on each of its claims.  *See Greenlight Capital, L.P. v. Apple, Inc.*, No. 13 Civ. 900 (RJS), 2013 WL 646547, at *4 (S.D.N.Y. Feb. 22, 2013) ("[t]o establish a likelihood of success on the merits, a plaintiff need not show that success is certain, only that the probability of prevailing is better than fifty percent") (internal quotation marks omitted).  To sustain a claim under Section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the

purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  For the reasons discussed below, Defendant violated Section 10(b) and Rule 10b-5 by materially misrepresenting the terms of the tender offer in the Invitation Memorandum and July 27 Public Statement, and doing so with either knowledge of falsity, or a reckless disregard for the truth.

### 1. Defendant Made Material Misrepresentations and Omissions in Connection with the Purchase or Sale of a Security

As set forth above, Ecuador has engaged in a host of deceptive and manipulative acts as part of its effort to fraudulently induce Plaintiffs and others to tender.  Specifically with respect to the July 27 Public Statement, Defendant has made three categories of materially misleading misstatements and omissions in connection with the purchase or sale of a security.[5]  *See supra* Section I.D.

First, Defendant made materially false and misleading statements that the tender was not coercive.  The entire conceit of the tender was coercive: for the reasons set forth above, the offer was designed to make non-tendering so financially unattractive that bondholders, including Plaintiffs, would have no choice but to agree, in order to avoid getting less value for their bonds and forfeiting their right to unpaid and accrued cash interest.

---

[5] Although the bonds at issue are not registered in the United States, they still constitute securities within the meaning of the Act under the clear law of this Circuit.  Nor does Defendant have any argument that the federal securities laws do not apply on grounds related to *Morrison v. National Australia Bank*, 561 U.S. 247 (2010).  In circumstances where, as here, the complaint contains extensive factual allegations detailing the transaction's multiple connections to the United States, courts have held that the plaintiff has sufficiently alleged the kind of "irrevocable liability" in the United States that brings the instruments at issue within the ambit of the federal securities laws. *See, e.g.*, *United States v. Vilar*, 729 F.3d 62, 77-78 (2d Cir. 2013); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 559-61 (S.D.N.Y. 2014) (Furman, J.).

Second, Defendant made materially false and misleading statements that the process was transparent.  It was anything but.  In fact, Ecuador refused to engage on the significant concerns expressed by Plaintiffs and others and, instead, announced a coercive tender with no notice and no sufficient time for bondholders to make considered decisions.

Third, Defendant made materially false and misleading statements that the tender was within the "four corners" of the indentures.  On the contrary, the tender offer constitutes a clear breach of the No Less Favorable Treatment Provision.  For starters, that provision does not merely require that existing bondholders *ultimately* receive no less favorable treatment in a subsequent restructuring.  The Provision requires Ecuador to "ensure" no less favorable treatment even "in the context of a simultaneous *offer* to exchange" the old debt for new debt.  (*See* Compl. Ex. 4 (Indenture for 2024 Bonds) § 7.3 (emphasis added).)  The Proposal clearly runs afoul of this obligation, because by its terms, it anticipates far worse treatment for non- or delayed-tendering bondholders than those who tender by July 31, 2020.

Specifically, the offer violates the No Less Favorable Treatment Provision in two respects: (a) only those existing bondholders who tender before the impending deadline of July 31 would receive a separate New PDI 2030 Bond that would effectively enable the bondholder to recoup 86% of the accrued and unpaid interest owed to them, while bondholders who do not tender—or who tender after the July 31 deadline—will not receive the New PDI 2030 Bond and will, unlike tendering bondholders, be left with 0% of their accrued and unpaid interest; and (b) the tender would also provide bondholders who consent with different—and more valuable—bonds compared to bondholders who do not consent.  The offer certainly does not square with anything in the "four corners" of the indentures.

Notwithstanding this clear evidence of a contractual breach, Ecuador may try to argue that a totally unrelated provision in the indentures—a so-called "collective action clause"—sanctions their conduct.  This argument has no merit.  The indentures do contain a clause that permits a supermajority of bondholders to approve modifications to the terms.  But even if Ecuador *could* use the collective action clause to eliminate the No Less Favorable Treatment Provision, the Provision still remains in force right now and the offer breaches it.

In any event, Ecuador simply *cannot* use the collective action clause to eliminate the No Less Favorable Treatment Provision.  At the most elemental level, if Ecuador makes a contractual promise not to do something, it cannot go out and do it.  And the collective action clause does not give them any way out.  The No Less Favorable Treatment Provision is, in effect, a minority rights protection; it would be absurd to allow even a supermajority, via a collective action clause, to eliminate a minority rights protection.  Otherwise, there would be no point in having a minority rights protection in the first instance.  It is black letter law that the indenture must be read as a whole and construed in a way that gives meaning to all provisions.  *See Crede CG III, Ltd. v. 22nd Century Grp., Inc.*, No. 16 CIV. 3103 (KPF), 2019 WL 652592, at *3 (S.D.N.Y. Feb. 15, 2019) ("[I]t is well settled that a contract must be read as a whole to give effect and meaning to every term … and avoid any interpretation that would render a contractual provision without force and effect."); *see also In re MF Glob. Inc*., 496 B.R. 315, 319 (S.D.N.Y. 2013).  The only construction that gives the No Less Favorable Treatment Provision meaning is one that does not allow it to be eliminated via the collective action clause.

Defendant had no duty to make the statements contained in the July 27, 2020 release.  But when it chose to speak, it undertook a duty to speak truthfully and absent material omission.  Because Defendant chose to speak about the terms and process related to its tender offer, and did

so in a false and misleading way, it also had a duty to correct its misstatements and disclose any additional facts necessary to make its statements not misleading. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 590 (S.D.N.Y. 2010). Defendant failed to do so, and is therefore liable for making materially false and misleading statements to bondholders.

### 2. Defendant Knew That Its Statements Were Materially Misleading When Made

Plaintiffs will succeed on the merits of establishing that Defendant made the alleged misrepresentations with scienter, *i.e.*, a mental state "embracing intent to deceive, manipulate, or defraud." *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 Civ. 8862 (GBD), 2013 WL 1286170, at *6 (S.D.N.Y. Mar. 28, 2013) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 n.12 (1976)). First, the complaint is replete with factual allegations "that constitute strong circumstantial evidence of conscious misbehaviour or recklessness." *Id.* (quoting *Lerner v. Fleet Bank. N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)). For one thing, in its July 22 Letter, the Steering Committee specifically put Ecuador on notice that the tender offer was coercive, lacked transparency, and treated non-tendering bondholders differently. *See* Compl. ¶ 48; Compl. Ex. 6. Nevertheless, Ecuador has now continued to assert that the process was not coercive, transparent, and within the four corners of the indentures.

Second, the fact that Defendant had "motive and opportunity to commit fraud" is obvious. *Absolute Activist*, 2013 WL 1286170, at *6. Not only does Defendant stand to gain "concrete benefits" as a result of its misrepresentations, but it also has the "means" and "likely prospect" of achieving those benefits through its fraudulent scheme. *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *Absolute Activist*, 2013 WL 1286170, at *6. Specifically, by forcing bondholders to irrevocably forfeit their contractual rights to unpaid and

accrued interest on their investments, and receive only \$0.91 on each dollar in bonds, which are likely worth significantly less than face value with longer maturities and lower interest rates than the existing debt, Defendant will be able to restructure its debt.[6]

Accordingly, Plaintiffs will succeed on the merits of establishing that Defendant acted with scienter in violation of Section 10(b).

### 3. Plaintiffs and the Class Relied on Defendant's Material Misstatements and Omissions

Defendant obviously intended to have undecided bondholders rely on the misrepresentations in its July 27 Public Statement, and indeed some undecided bondholders have certainly already relied on those misrepresentations in choosing to tender. Through its material false and misleading statements to bondholders at large, Defendant has committed a fraud on the market. In precisely this context, the Supreme Court has recognized that bondholders may satisfy the element of detrimental reliance through the fraud-on-the-market presumption. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-43 (1988). Here, where the false statements were made in a press release specifically geared to the securities market, this presumption is well founded and more than sufficient to establish reliance by the Plaintiff class.

---

[6] Ecuador has no basis to claim it is immune from this suit on sovereign immunity grounds. The Foreign Sovereign Immunities Act of 1976 establishes an exception from sovereign immunity for "commercial activity." *See* 28 U.S.C. § 1605(a)(2). The Supreme Court has expressly held that where a foreign sovereign issues debt denominated in U.S. dollars and employs a financial agent in this country, the "commercial activity" exception applies and the sovereign enjoys no immunity. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619-20 (1992). And the Second Circuit has even held, in particular, that a sovereign is not immune from claims for securities fraud related to debt instruments in the United States. *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016).

### 4.    Absent Injunctive Relief, Defendant's Material Misstatements and Omissions Will Cause Plaintiffs' Loss

Plaintiffs will also succeed in proving loss causation.  "[I]n order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation."  *Citibank N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (noting that "loss causation has often been described as proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.") (citation omitted); *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001) ("[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.").

Here, there can be no doubt that the Defendant's fraud already has caused loss, and will cause loss, to the Plaintiffs and the class of bondholders it represents.  As to the former, bondholders who have tendered because of the Defendant's fraud already have incurred damages, in the form of reduced principal, reduced interest, and bonds otherwise devalued because of fraud.  As to the latter, bondholders who will tender—as Plaintiffs will absent judicial intervention—will incur damages, in the form of reduced principal, reduced interest, and bonds otherwise devalued because of fraud.  Because Plaintiffs represent the class of bondholders who have been fraudulently induced to tender, as well as those who will be coerced into tendering absent judicial intervention, Plaintiffs will succeed in proving loss causation.  *See also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (stating that "the loss causation requirement will be satisfied if [Defendants' deceptive or manipulative] conduct had the effect of concealing the circumstances that bore on the ultimate loss.").

### D.      Preliminary Injunctive Relief to Plaintiffs Favors the Public Interest

Having established Plaintiffs' irreparable harm and the likelihood of success on the merits, the Court must next consider whether the public interest would be served by the issuance of a preliminary injunction.  Where, "it appears likely that the offer may contain materially misleading statements or omissions as made, the interest . . . of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated."  *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250-51 (2d Cir. 1973).  Moreover, any doubts as to whether a preliminary injunction is necessary to safeguard the public interest protected by the securities laws should be resolved in favor of granting the injunction.  *Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 699 (2d Cir. 1973); *see also Clemente Glob. Growth Fund, Inc. v. Pickens*, 705 F. Supp. 958, 971 (S.D.N.Y. 1989) ("The public, of course, has an interest in enforcement of the securities laws . . . .").  Here, given that the tender is infected by fraud, the public's interest would clearly be served by granting the preliminary relief that Plaintiffs have requested on behalf of itself and others similarly situated.

### E.      The Balance of Equities Tips in Favor of Granting Preliminary Injunctive Relief to Plaintiffs

The final consideration in deciding whether to issue an injunction is whether the hardship sustained by the movant if the injunction is denied is greater than the hardship to the non-movant should the injunction be granted.  *See, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010); *Secured Worldwide LLC v. Kinney*, No. 15 Civ. 1761 CM, 2015 WL 1514738, at *22 (S.D.N.Y. Apr. 1, 2015) ("A defendant's misconduct . . . may tip the balance of equities in favor of an injunction."); *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F. Supp. 2d 241, 248-49 (S.D.N.Y. 2001) (finding a balance of hardships tipping in plaintiff's

favor where there was "a continuing pattern of bad-faith by [defendant] in evading creditor claims" and no serious risk to defendant's business).

The equities strongly favor Plaintiffs, the other members of the Steering Committee, and similarly situated bondholders.  As demonstrated above, absent an injunction, Plaintiffs and others will suffer significant irreparable harm because they will have no choice but to tender thereby: (i) losing a meaningful chance to recover any money judgment, given Ecuador's precarious financial situation and its stated threat to default on the debt of non-tendering bondholders; (ii) accepting the elimination of the No Less Favorable Treatment Provision; and (iii) accepting the removal of other important contractual guarantees (*e.g.*, reducing the threshold needed to give effect to a Non-Reserved Matter Modification and forgoing certain requirements related to certain events of default).  (*See* Section II, *supra*; Ginnings Decl. ¶¶ 15-17.)  The equities also favor Plaintiffs because, as a member of the Steering Committee representing 25 global institutional investors with at least hundreds of millions of dollars of holdings, it tried, in good faith, to negotiate with Ecuador, only to be met with stony silence, and then the unpleasant surprise announcement of a coercive tender.

By contrast, the risk to Ecuador is minimal.  At most, Ecuador will be prevented from perpetuating a fraudulent tender offer and from continuing to breach its contractual and legal obligations under the terms of the bond indentures.  It also bears noting that nothing would prevent Ecuador from ultimately restructuring its debt—as long as such a restructuring comports with the commitments Ecuador made to its existing bondholders and as long as it occurs in a process free from fraud and coercion.  Simply put, the "negative impact on [Plaintiffs] were this Court to deny its motion far outweighs the negative impact on [Defendant] were this Court to rule

otherwise." *R Squared Glob. v. Serendipity 3, Inc.*, No. 11 Civ. 7155 (PKC), 2011 WL 5244691, at *8 (S.D.N.Y. Nov. 3, 2011).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court: grant this Motion and issue a temporary restraining order and/or preliminary injunction; preliminarily enjoin Ecuador, and any of its affiliates or others acting in concert with it, from proceeding with the transactions announced on July 20, 2020, or any parts thereof; order the Republic to: (a) toll the expiration date for the transactions announced on July 20, 2020, which date is currently set for July 31, 2020 at 5:00 p.m. CET, for a period of time equal to the period of time between the signing of this order to show cause and the hearing for a temporary restraining order, and (b) enable bondholders who have already tendered Eligible Bonds to promptly withdraw their consents and tender orders unconditionally; and award such other relief as the Court deems equitable and proper.

Dated: July 29, 2020
   Greenwich, Connecticut

Respectfully submitted,

LATHAM & WATKINS LLP

/s/ Christopher J. Clark
Christopher J. Clark
885 Third Avenue
New York, New York 10022
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: chris.clark@lw.com

*Attorney for Plaintiffs Contrarian Emerging Markets, L.P., GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund*