UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONTRARIAN EMERGING MARKETS,
L.P., GMO EMERGING COUNTRY DEBT
FUND, GMO EMERGING COUNTRY DEBT
INVESTMENT FUNDS PLC, and, GMO
EMERGING COUNTRY DEBT (UCITS)
FUND, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

    -against-

THE REPUBLIC OF ECUADOR,

      Defendant.

Case No. 1:20-CV-05890-VEC

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT.............................................................................................................................5

    I.  PLAINTIFFS HAVE SELECTED THE WRONG FORUM AND HAVE NO
        AUTHORITY TO PROCEED PURSUANT TO THE INDENTURES .........................6

    A.  Plaintiffs' Application for Temporary Relief should be Dismissed Because their Claims
are Subject to Arbitration before the LCIA and Any Related Judicial Claims Must be
Brought before the English Courts ..................................................................................6

    II.Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits ..........................8

    B.  Plaintiffs Cannot Point To Any Deception In A Fully Accurate Consent Solicitation ....8

    C.  Plaintiffs' Claim That The Press Release Contains False Statements Is Specious ..........8

    III.  There Is Not Irreparable Harm Because Plaintiffs' Alleged Injury Can Be Remedied
        Through Money Damages ...........................................................................................13

    A.  Standard....................................................................................................................13

    B.  Plaintiffs'  Injuries Arise Exclusively By Virtue Of An Alleged Breach Of the "No Less
Favorably" Provision In The Indenture, And Therefore They Have Adequate Remedies At
Law ..............................................................................................................................14

    IV.  The Balance Of The Hardships Tips Decidedly Towards The Republic As It Strives To
        Restructure For The Benefit Of The Ecuadorian Economy And Its Citizens ...............16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin*,
 754 F.2d 1015 (2d Cir. 1985), *overruled on other grounds, O'Lone v. Estate
 of Shabazz*, 482 U.S. 342 (1987)................................................................5

*Andino v. Fischer*,
 555 F.Supp. 2d 418 (S.D.N.Y. 2008) .........................................................5

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) ....................................................................................9

*Bell & Howell*: *Mamiya Co. v. Masel Supply Co.*,
 719 F.2d 42 (2d Cir. 1983) .........................................................................6

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
 506 F. App'x 32 (2d Cir. 2012) .................................................................12

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
 598 F.3d 30 (2d Cir. 2010) .......................................................................16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014) .......................................................................9

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005) ....................................................................................9

*Echo Design Group, Inc. v. Zino Davidoff S.A.*,
 283 F.Supp.2d 963 (S.D.N.Y.2003)............................................................5

*Freedom Holdings, Inc. v. Spitzer*,
 408 F.3d 112 (2d Cir. 2005) .....................................................................13

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
 917 F.2d 75 (2d Cir. 1990) .........................................................................5

*Katz v. Oak Indus., Inc.*,
 508 A.2d 873 (Del. Ch. 1986).....................................................................14

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) ....................................................................................5

*NML Capital, Ltd. V. Republic of Argentina*,
 144 F. Supp. 3d 513, 520 (S.D.N.Y. 2015) ...............................................15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................................................................ 10, 11, 13

*Piper v. Chris-Craft Indus. Inc.*,
  430 U.S. 1 (1977) ..................................................................................... 8

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ................................................................... 13

*Shapiro v. Cadman Towers, Inc.*,
  51 F.3d 328 (2d Cir. 1995) ....................................................................... 6

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*,
  190 F.Supp.2d 577 (S.D.N.Y.2002) ......................................................... 5

*Winter v. Nat'l Res. Def. Council Inc.*,
  555 U.S. 7 (2008) ................................................................................. 5, 6

**Statutes**

Exchange Act Section 14 ............................................................................. 8

Securities Exchange Act Section 10(b) ............................................... *passim*

**Other Authorities**

Federal Rules of Procedure Rule 65 ............................................................ 5

Defendant The Republic of Ecuador (the "Republic") respectfully submits this memorandum in opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs are sophisticated distressed hedge funds that purchased bonds issued by the Republic pursuant to Indentures, which set forth the rights and obligations of the bondholders and the Republic.  In fact, the terms of the Invitation only permit participation by  U.S. persons that are institutional accredited investors or qualified institutional buyers, which are high sophisticated investor criteria.  Plaintiffs waited until the 11th hour to enjoin a Consent Solicitation and Exchange (the "Consent Solicitation"), announced on July 20, 2020, which is a critically important step in the Republic's effort to restructure over $17 billion of public debt. The terms of the Consent Solicitation terms were clearly spelled out in a 277 page Invitation Memorandum distributed to all eligible bondholders.[1]  If the Consent Solicitation is enjoined, the Republic and its citizens will suffer significant harm given that, absent the completion of the transactions proposed by the Republic, the Republic will default under the indentures and risk cross-default under different series of bonds.

The Complaint asserts a single cause of action against the Republic for securities fraud under Section 10(b) of the Securities Exchange Act.  (Compl. ¶¶ 80-88).  However, nowhere in the Complaint or moving papers do Plaintiffs allege any facts demonstrating that the Invitation Memorandum contains any material misstatement of fact or actionable omissions, which are key threshold elements for its securities fraud claim.  Instead, Plaintiffs base their entire securities

---

[1] Plaintiffs omit key facts relating to the Consent Solicitation and Invitation Memorandum.  The restructuring of the Republic's debt and the determination to proceed with the Consent Solicitation did not occur in a vacuum.  The Republic was in discussions with large groups of bondholders, a majority of which support the Consent Solicitation.   (*See* Exhibits 1 and 2, attached hereto (press releases by the Ad Hoc Group of Ecuador Bondholders.)

fraud claim on generalized statements in a Press Release, issued by the Republic on July 27, 2020 (attached to the Motion as Exhibit 1), in which the Republic responded to a press release about the Consent Solicitation by the Steering Committee.  Nothing in the Press Release constitutes actionable securities fraud.

Nevertheless, Plaintiffs have attempted to convert their contract claim into a U.S. securities fraud claim based on the Press Release in a transparent attempt to circumvent the forum selection provision in the indentures governing Plaintiffs' bonds.  Each of the indentures at issue contains a broad dispute resolution provision, requiring that "any dispute, controversy or claim of any nature arising out of, relating to or having any connection to this indenture . . ." shall "not be referred to a court of any jurisdiction and shall instead be referred to and finally resolved by arbitration under the Rules of [the London Court of Arbitration].   Thus, as a threshold matter, this case does not belong in the Court.

Plaintiffs argue that, despite the broad LCIA arbitration clause, they are entitled to seek injunctive relief in this court for a violation of the U.S. securities laws.  Plaintiffs are wrong.  The indentures clearly provide the courts in London, England, with "supervisory authority" over all matters and there was no reason Plaintiffs could not seek relief in the proper court if necessary.  The notion that the Complaint states a claim under the U.S. securities laws is a fallacy.  To the contrary, as the facts alleged in the Complaint make abundantly clear, Plaintiffs main grievance is that they believe — albeit incorrectly — that the consent solicitation is "coercive" and that non-tendering bondholders are being treated unfairly and in breach of the "no less favorably" provision in the indentures.  Plaintiffs' remedy is, therefore, in the LCIA arbitration to which they agreed.  Moreover, Plaintiffs have failed to demonstrate their authority to bring this litigation given that the indentures have a standard collective actin provision (Section 4.5), which

prohibits individual holders from instituting "any suit, action or proceeding in equity or law under or with respect to the Indenture" without the consent of the Trustee or the support of at least 25% in aggregate principal amount of the bonds.  This is a standard feature in sovereign bond indentures, and it prevents economically motivated holdouts, such as Plaintiffs, from holding up unfairly time-sensitive sovereign debt restructurings.

Even if Plaintiffs were to establish a basis to proceed in this Court, and not in the LCIA and/or the English courts, Plaintiffs cannot establish the minimum requirements for obtaining a preliminary injunction.  Plaintiffs cannot establish a likelihood of success on the merits. Plaintiffs disclosure claims rely exclusively on the Republic's statements in the Press Release. Plaintiffs point to several statements in the Press Release in the Motion (*see* Plaintiffs' Memorandum of Law, at 10-11), but fail to explain how or why those statements are false or materially misleading.  When pressed on why or how the statements in the Press Release are false, Plaintiffs can identify no *fact* that was misrepresented.   They retreat, instead, to generic complaints about what they say is the "coercive" nature of the consent solicitation (which is not a basis for a federal securities claim), and their claim that the modifications violate the indenture (a straightforward contract matter and, likewise, not a basis for a federal securities claim).   The argument falls apart when viewed against the real facts.

The Invitation Memorandum provides comprehensive disclosures of the economic terms and the associated risk to all bondholders.   The fact that the Press Release conveys the Republic's disagreement with Plaintiffs about whether the Consent Solicitation is coercive or not, does not change the fact that all material terms of the Consent Solicitation and associated risks were disclosed to all bondholders, and Plaintiffs cannot point to anything in the Invitation Memorandum that is misleading.   And the notion that Plaintiffs were misled or did not

3

understand their economic choices based on the Press Release regarding the fully disclosed economic terms of the Consent Solicitation is simply not believable.  It is beyond dispute that plaintiffs are being given a choice based on accurate facts full knowledge of the risks.  In fact, all bondholders in the Consent Solicitation are being treated exactly the same; there is no disparate treatment among bondholders as a whole.   All bondholders are free to make an independent decision to tender or not to tender in the Consent Solicitation.  The fact that the Consent Solicitation provides an incentive for bondholders to tender is not as a matter of law coercion.

Plaintiffs also fail to establish imminent, irreparable harm.  Plaintiffs argue that, absent an injunction, they will be forced to tender their bonds in the Consent Solicitation, and thus, by *ipse dixit,* the Consent Solicitation is purportedly "coercive".   However, nothing compels Plaintiffs to tender, and if they are free to pursue their contractually remedies for breach of the "no less favorably" provision of the indentures if they believe it is in their economic interests to do so.  And, in fact, Plaintiffs initiated the LCIA arbitration to enforce their breach of contract rights and to seek damages for the difference between the value that tendering bondholders will receive in the Consent Solicitation as compared to the value that will be received by non-tendering shareholders.   The law is clear that there can be no irreparable harm where the movant has an adequate remedy as law, as is the case here.

Finally, the balance of the hardships weighs decisively in favor of the Republic when plaintiffs can show nothing more than the possible loss of money (for which it has a clear remedy at law) if the Court denies the injunction.   On the other side, the Republic is in the process of a delicate restructuring process that involves negotiations with, among others, the International Monetary Fund  and other bi-lateral creditors (such as China).   A delay in the process beyond August 10 will put the Republic into a massive default, which will not only

cripple its finances but also severely affect its efforts to obtain other financing, causing devastating humanitarian and social effects.  For the following reasons, the Court should dismiss the Complaint for lack of jurisdiction and otherwise deny the Motion.

## ARGUMENT

This Court should deny Plaintiffs' request for a temporary restraining order.  The standard for a temporary restraining order in the Second Circuit is the same for a preliminary injunction. *See e.g.*, *Andino v. Fischer*, 555 F.Supp. 2d 418, 419 (S.D.N.Y. 2008); *Echo Design Group, Inc. v. Zino Davidoff S.A*., 283 F.Supp.2d 963, 966 (S.D.N.Y.2003); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical.").  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  A preliminary injunction is never granted "as of right," *Winter v. Nat'l Res. Def. Council Inc.*, 555 U.S. 7, 24 (2008); whether to grant one "rests in the sound discretion of the district court."  *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

The Court should not use that discretion here; Plaintiffs have not shown irreparable harm or likely success on the merits, and both the balance of hardships and the public interest counsel against issuing a restraining order.  For the Court to issue a preliminary injunction, Plaintiffs must show that they are "likely to succeed on the merits." While Plaintiffs need not show success is "an absolute certainty," at a minimum, the "probability" of success is required. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).  Second, that they are "likely to suffer irreparable harm in the

absence of preliminary relief."  Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction. *Bell & Howell*: *Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983).  "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).  Third, Plaintiffs must prove that "the balance of equities tips in [its] favor," and fourth, that a temporary restraining order "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  None of these factors support Plaintiffs' request, indeed they directly undercut it.

I.    **PLAINTIFFS HAVE SELECTED THE WRONG FORUM AND HAVE NO AUTHORITY TO PROCEED PURSUANT TO THE INDENTURES**

A.    **Plaintiffs' Application for Temporary Relief should be Dismissed Because their Claims are Subject to Arbitration before the LCIA and Any Related Judicial Claims Must be Brought before the English Courts**

Section 11.7 of each of the Indentures requires that the claims asserted in this action be adjudicated exclusively in arbitration in England under the rules of the London Court of International Arbitration.  Section 11.7 provides in relevant part:

> Any dispute, controversy or claim of any nature arising out of, relating to or having any connection with this Indenture, including any dispute as to the existence, validity, interpretation, performance, breach, termination or consequences of the nullity of this Indenture (a "Dispute"), where the Republic is either a party, claimant, respondent or otherwise is necessary thereto, shall not be referred to a court of any jurisdiction and shall instead

be referred to and finally resolved by arbitration under the Rules of the

LCIA ("LCIA Rules"). . .

This broad language, which covers any dispute "having any connection with" the

indenture, would plainly include a securities fraud claim arising out of an alleged violation of the

terms of the indenture.    It is well accepted that U.S. federal securities fraud claims may be

subject to arbitration.

Plaintiffs argue that their request for preliminary injunctive relief is properly before this

court as it involves the need for interim relief without which the Plaintiffs' could not obtain full

relief in arbitration.   Contrary to plaintiffs' position, the Indenture specifically provides that such

actions will be brought in the English courts – not in New York.   Section 11.11(d) of the

Indentures provides that the Republic waives its sovereign immunity for 3 categories of claims:

(1) arbitration claims pursuant to the arbitration provision; (2) actions to enforce any arbitration

award; and (3) proceedings in Ecuador.   Section 11.11(d) further provides that "the Republic

submits to the jurisdiction of the English courts in connection with any proceedings invoking the

supervisory jurisdiction of those courts in relation to an arbitration conducted pursuant to Section

11.7.

This action is, therefore, subject to the supervisory jurisdiction of the English courts:

Accordingly, the parties have expressly agreed to the English Courts as the

jurisdiction for bringing claims that are within the supervisory authority of the

courts, including applications for interim relief.    The Republic submits that

these provisions constitute a binding agreement not to bring any such claim in

any other court (including New York), and/or that based on the clear intent of

these provisions to litigate such matters in England, the Court should decline to

exercise its equitable powers and refer any such claims to the courts of England.

## II.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### B.  Plaintiffs Cannot Point To Any Deception In A Fully Accurate Consent Solicitation

Plaintiffs fail to plead a meritorious claim under Section 10(b) given the Republic's detailed

and transparent disclosures in the Invitation Memorandum.   Although Plaintiffs acknowledge

that Section 14 of the Exchange Act does not apply,[2] that provision of the U.S. securities laws

was enacted for the "sole purpose" of ensuring investors confronted with a tender offer have

"adequate information".  *Piper v. Chris-Craft Indus. Inc.*, 430 U.S. 1, 35 (1977).   Thus, "[t]he

probability of success on the merits in any application for injunctive relief . . . turns greatly upon

whether the plaintiff has shown that the tender offer under attack has misstated or omitted

material facts."  [Check the Perrigo case if it goes our way], No. 15 Civ. 7341 (NRB), 2015 WL

9916726, at *4 (S.D.N.Y. Oct. 29, 2015).  Here, Plaintiffs have not established it is likely to

succeed on the merits because they have wholly failed to identify a misleading statement in, or

material fact that has been omitted from the Invitation Memorandum.

### C.  Plaintiffs' Claim That The Press Release Contains False Statements Is Specious

Absent anything in the Invitation Memorandum that is remotely misleading, Plaintiffs resort

to the Press Release as the source of its U.S. securities fraud claim.  Their attempt to bootstrap

the Press Release into an actionable securities fraud claim is wholly without merit.

---

[2] The Republic reserves the right to argue the lack of extraterritorial application of Section 10(b) in this case.   It is not necessary for the Court to reach that issue given that the Court lacks jurisdiction under the Dispute Resolution provision, and otherwise, Plaintiffs have failed to meet their burden on the traditional injunction factors.

Plaintiffs have failed to allege any actionable misrepresentation under Section 10(b) of the Securities Act.  To establish liability under Section 10(b), Plaintiffs must show: (1) the Republic made a material misstatement; (2) the misstatement was made with scienter; (3) there is a connection between the misrepresentation Plaintiffs' purchase of a security; (4) the Plaintiff relied on the misstatement or omission; (5) the plaintiff suffered economic loss; (6) there is a causal connection between the material misrepresentation and the loss suffered.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

The only source of the alleged material misstatements relied on by Plaintiffs, as confirmed by Plaintiffs' counsel before this Court during the July 30 telephone conference, is the Republic's July 27 Press Release (*See* Mem. At 9.).  No statement identified by Plaintiffs— indeed no statement contained in the Press Release at all—is actionable under Section 10(b).

For a fact to be material there must be a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]" or in other words "there must have been a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) (internal citations and quotation marks omitted). General statements, such as those pertaining to reputation, integrity, and compliance with ethical norms, are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir.2009)).

Further, statements of opinion are protected and not actionable under Section 10(b). A statement of opinion is not materially false just because it is incorrect, unless it is not "honestly

held" or omits facts about the basis for holding the view, and those facts conflict with what a reasonable investor would understand from the statement itself.   The federal securities laws do not "allow investors to second-guess inherently subjective and uncertain assessments.  In other words, the provision is not … an invitation to Monday morning quarterback an issuer's opinions." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

Plaintiffs have failed to meet their burden that the statements in the Press Release Thewere false,  misleading,  or  material.  They were, at most, generic statements and opinions, issued in response to Plaintiffs' own public accusations.

The first of these allegedly false statements is that "[t]he [Steering Committee] asserted that the Republic negotiated with them in bad faith and characterized the process as 'coercive.' Nothing could be further from the truth."  Compl. ¶ 55.  Plaintiffs assert that this is a false claim "about the complete lack of coercion of the tender."  *Id.*  The argument makes no sense.  The statement that the Steering Committee asserted that the Republic negotiated with them in bad faith is clearly a subjective opinion and not actionable.   The fact that Plaintiffs and the Republic have a difference of opinion regarding the negotiations is likewise opinion, and the statement in the Press Release is merely iterating the Republic's position.  Moreover,  That Plaintiffs are unsatisfied with either option does not mean the tender is coercive.  Plaintiffs – sophisticated investors specializing in distressed debt – were well aware of the terms of the indenture, and knew they could be modified through the Collective Action Clause.  And yet, they signed it. Notwithstanding the accuracy of the Republic's statement that "[n]othing could be further from the truth," it is not an actionable under Section 10(b).   *See Omnicare,* 757 U.S. at 186.

Plaintiffs also claim that the Republic "never meaningfully engaged in any way with the Steering Committee," and therefore the above statement is "false."  Memo. at 10.  Further,

Plaintiffs dispute the Republic's claim that "[d]uring the month of June, the Republic formally approached the Minority Committee and attempted to engage in confidential negotiations, but the advisor to the Minority Committee spent two weeks negotiating the wording of the Non-Disclosure agreements . . ."  Although the Republic stands by its statements, they are an opinion and are not material.  *See Omnicare,* 757 U.S. at 186.

The second allegation – concerning the statement that there is "nothing improper or unusual" about a consent fee – is similarly inactionable. Compl. ¶ 59.  Plaintiffs fail to show that a consent fee was unusual or atypical in these type of transactions or that the Republic made the statement knowing that a consent fee was unusual or atypical.   Plaintiffs imply the Republic's statement is false because it allegedly violates the No Less Favorable Treatment Provision. Memo. at 10.  But that does not mean that the statement is false.  It merely means that Plaintiffs have a different contractual interpretation of the No Less Favorable Treatment provision and whether a consent fee is a violation of the contract.   A consent fee is standard practice in restructurings of this kind and serves as an incentive to bondholders to participate in the tender. To the extent there is an implied opinion on the Republic's part that there is nothing improper or unusual about this *specific* consent fee, it is just that, an opinion.  The Republic believes the consent fee is completely consistent with the goals of this transaction.  All bondholders have the same choice as Plaintiffs.  This is not a situation where this choice is only granted to a certain set of bondholders, and is therefore not a violation of the provision.  To the extent Plaintiffs claim there was an omission regarding the nature of the payment, they are incorrect.  The terms of the Invitation Memorandum explicitly spell out the nature of the consent payment—including who receives it and who does not—the only "omission" is the characterization Plaintiffs' give it. This is neither material, nor misleading.

Plaintiffs then allege that the statements that Ecuador is not seeking "to compel the consent of the investor," "[t]he payment of a consent fee in the form of the PDI 2030 Bonds provides a financial incentive for holders to provide their consent to the amendments and accept the terms of the restructuring," and that the Steering Committee has "no basis to argue that they are being treated in an unequal manner" are false.  Memo. at 10.  But they fail to explain how these statements — that merely articulate the Republic's position — are factually false.  Plaintiffs seem to suggest that, because they believe the Consent Solicitation is coercive, the contrary statement by the Republic that the Consent Solicitation is not coercive, makes the Republic's statement in the Press Release false.    This circular and conclusory argument has no basis.

Plaintiffs also rely on the statements that "[t]he Republic's focus is on … a process that is open to all bondholders and which fundamentally applies to principles of inter-creditor equity" and "[t]he Republic is committed to a … transparent process."  Memo.  at 10.  According to Plaintiffs, these are false and misleading statements and omissions about the tender offer and process.  Plaintiffs' reliance on this statement is wholly misplaced for the same reason that all of the statements they rely on in the Press Release are not false.  There is no dispute that the Consent Solicitation was open to all bondholders, therefore, that statement cannot be false.   The statement that the Republic was focused on "principles of inter-creditor equity" and was committed to a "transparent process" is clearly a statement of opinion.  While Plaintiffs may disagree with that opinion, the fact that they believe the Republic acted consistent with principles of inter-creditor equity or was not committed to a transparent process does not render the statement false.  All bondholders have been invited to participate in the tender process.  All the terms of the consent process have been publicly disclosed in the Invitation Memorandum.

Further, the Republic's statements are merely opinions of the Republic regarding the process. They are neither misleading nor false. *See e.g.*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (finding statements such as "[the relevant code of practices and procedures] underscores our own dedication towards transparent and independent decision-making process" and "[t]he integrity, reliability and credibility of S & P has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are condiment it will be so in the future" inactionable puffery).

Lastly, Plaintiffs claim the Republic falsely asserted it was "acting within the four corners of our indentures." Memo. at 11. This claim is not actionable under Section 10(b), as statements concerning the legality or propriety of a course of action are opinions. *Omnicare*, 575 U.S. at 186 (finding Defendants' statements to the effect of "we believe we are obeying the law" were not actionable). Again, the fact that Plaintiffs believe that the indentures require a different course of action under the indentures, or that the Consent Solicitation is a breach does not make the statement in the Press Release false.

## III.   THERE IS NOT IRREPARABLE HARM BECAUSE PLAINTIFFS' ALLEGED INJURY CAN BE REMEDIED THROUGH MONEY DAMAGES

### A.  Standard

As the "single most important prerequisite" in the preliminary injunction analysis, irreparable harm must be established "before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). The litigant must demonstrate that the injury alleged is "actual and imminent," not merely possible, and cannot be remedied in money damages. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Plaintiffs cannot satisfy this stringent burden.

**B.  Plaintiffs' Injuries Arise Exclusively By Virtue Of An Alleged Breach Of the "No Less Favorably" Provision In The Indenture, And Therefore They Have Adequate Remedies At Law**

Stripped of any actual misrepresentation, Plaintiffs' only argument is that they are harmed irreparably by virtue of the fact that—in their *opinion*—the tender offer is "coercive."  Plaintiffs' characterization of the tender offer and their perceived harm is belied by the facts, as detailed below.  Most importantly, moreover, their filing today of a Request For Arbitration (RFA) in the seeking money damages for breach of the Indenture is direct evidence that Plaintiffs have an adequate and available remedy in damages, foreclosing a preliminary injunction in this case.

Plaintiffs predicate their claim of irreparable injury on three factors.  *First*, Plaintiffs argue that by virtue of Defendant's alleged material misstatements, Plaintiffs will be "forced . . . against their will and under duress" to tender and exchange their bonds and waive protections afforded by the No Less Favorable Treatment Provision in the Indenture.  Pl. Mem. at. 12. Putting aside that Plaintiffs cite no authority to support such a claim, their characterization of the Consent Solicitation as coercive is simply inaccurate.  To be sure, the Consent Solicitation provides all bondholders with the *same* voluntary choice:  to tender or not to tender.  Each bondholder, including Plaintiffs—distressed debt specialists and/or sophisticated emerging market investors—is free to make the same economic choice and at its sole discretion; namely, to tender and to receive the economic benefits concomitant with tendering, or, not to tender, thus preserving their rights to seek damages based on any perceived breach of the Indenture.  *See Katz v. Oak Indus., Inc.*, 508 A.2d 873, 881-82 (Del. Ch. 1986) (offer not coercive based on encouraging consents).

In fact, Plaintiffs have done just that.  Today, they filed a Request for Arbitration in the LCIA for breach of the Indenture concerning the No Less Favorable Treatment Provisions.

Notably, the RFA is virtually identical to the allegations set forth in the Complaint in this action. Of importance here, the RFA alleges that "Contrarian has suffered damages due to the Republic's breach of the Indenture through is coercive and inequitable Proposal and its breaches of the No Less Favorable Treatment Provision" and seeks damages "estimated at multiple *millions of U.S. dollars*," in an amount to be proven in this arbitration," along with pre and post award interest on those amounts.  RFA at paras. 48-49.  Far from supporting Plaintiffs' position that their injury is imminent, irreparable and unable to be compensated by money damages, the RFA makes clear that Plaintiffs believe that money damages will remedy the alleged harm articulated in the Complaint in this action.

*Second*, Plaintiffs cite *NML Capital, Ltd. V. Republic of Argentina*, 144 F. Supp. 3d 513, 520 (S.D.N.Y. 2015) for the proposition that their position will be subordinated to the tendering bondholders if the tender offer proceeds, in violation of a contractual promise, which constitutes irreparable harm.  NML is wholly distinguishable.  In that case, the Republic of Argentina *passed legislation* prohibiting payments on bonds issued pursuant to a Fiscal Agency Agreement (the "FAA Bonds").  As a result of the legislation, FAA bondholders refusing to exchange FAA Bonds with newly issued bonds were foreclosed from receiving any payment of any kind, and without any monetary remedy because of the legislation.  *Id.* At 517.  That is simply not the case here, where all bondholders are on equal footing as to whether to tender or not, and while the new bonds carry different consideration (i.e., an incentives), none of the bondholders, whether they tender or not, will be foreclosed from receiving payments.

*Finally*, Plaintiffs argue that they will suffer irreparable harm given Ecuador's "perilous financial state."  Pl Mem. at 13.  Plaintiffs cite no evidence for such a statement other than a statement by Defendant in the Invitation Memorandum that the COVID-19 pandemic "has had

severe impact on the Republic's economy." This statement, in and of itself, does not lead to the unsupportable conclusion reached by Plaintiffs that any judgment would be "uncollectable." And in any event, if Plaintiffs are concerned about collectability of any judgment, their remedy is to seek security from the arbitral tribunal, not an injunction in this Court.

## IV.    THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY TOWARDS THE REPUBLIC AS IT STRIVES TO RESTRUCTURE FOR THE BENEFIT OF THE ECUADORIAN ECONOMY AND ITS CITIZENS

Even if the Court determines that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," Plaintiffs cannot prove that the balance of hardships tips decidedly in its favor. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The balance of hardships tips decidedly towards Defendant given that fact that Plaintiffs have an adequate remedy at law – namely, money damages, as evidenced by their commencement of an arbitration in the London Court of Arbitration seeking damages for the very claims they are asserting here.

On the other hand, a preliminary injunction would cause irreparable harm to Defendant as it will likely force a default on the Republic's existing bonds on August 10, 2020, just eleven days from now. On April 17, 2020, Holders of the Eligible Bonds gave their consent to certain proposed amendments to each of the Ecuador Eligible Bonds pursuant to two consent solicitations under which the Republic requested holder consent to modify the applicable indentures of the Eligible Bonds to defer until August 10, 2020, all scheduled interest payments due under the Eligible Bonds between March 27, 2020 and July 15, 2020. *See* Invitation Memorandum, Appendix A, at A-14. The solicitations provided that if a new successor IMF supported program was publicly announced by August 10, the date would be extended to August 15, 2020. (The date is referred to in the Invitation Memorandum as the "August 2020 Specified

Date".)  As of today's date, a new successor IMF supported program has not been publicly announced, so the August 2020 Specified Date is August 10, 2020.  To be clear, this deferral of interest rate payments until August 10 means that if the Republic does not close the Invitation to Exchange by that date or receive a further waiver and extension from the holders, the Republic will be in default under the terms of all of its eligible bonds.[3]

In the Invitation to Exchange, the Republic has sought waivers of a number of provisions, including a deferral of interest past the August 10 date.   Enjoining the Republic from continuing, accepting or consummating the Invitation to Exchange will preclude the Republic from receiving and giving effect, if received, to the consents of eligible holders to extend the deferral of interest past the August 2020 Specified Date. If the extension does not occur by August 10, 2020, the Republic will be in default under not only the $17.4 billion of bonds at issue here, but also would be in cross-default of more than $5 billion additional debt to banks and other organizations.  A broad default could well prevent the Republic from being able to obtain financing at all, crippling its economy.  The Republic is currently negotiating with certain of its bilateral creditors for new financing.  It is unlikely that these creditors will agree to inject new financing if the Republic is in default under existing indebtedness.  The Republic's economic recovery plans are contingent upon new financing being obtained and if such financing is not obtained, the social and economic costs and havoc that could occur on Ecuador would be disastrous.

---

[3] The August 20 date referenced by Plaintiffs' counsel is not the date on which the Republic goes into default without a further extension; that date is August 10.   If by August 10, the consent solicitation has been completed and the requisite percentages obtained, then the Republic (which now will not be in default because of the successful consent solicitation) has the option of extending the closing of the transactions until August 20 (and indeed September 1) to enable it to complete IMF financing which is a condition of closing.  *See* Invitation Memorandum, at iv-v.

Dated:  New York, New York  
       July 30, 2020

Respectfully submitted,

By:  /s/ Dennis H. Tracey, III  
Dennis H. Tracey, III  
Michael C. Hefter  
HOGAN LOVELLS US LLP  
390 Madison Avenue  
New York, NY 10017  
Tel.: (212) 918-3000  
Fax: (212) 918-3100  
dennis.tracey@hoganlovells.com  
*Attorneys for Defendant the Republic of Ecuador*