**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CONTRARIAN EMERGING
MARKETS, L.P., GMO EMERGING
COUNTRY DEBT FUND, GMO
EMERGING COUNTRY DEBT
INVESTMENT FUND PLC, and GMO
EMERGING COUNTRY DEBT (UCITS)
FUND, Individually and On Behalf of All
Others Similarly Situated,

                Plaintiffs,

  -against-

THE REPUBLIC OF ECUADOR,

                Defendant.

20 Civ. 5890 (VEC) (OTW)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................1

I.      PLAINTIFFS ARE APPROPRIATELY SEEKING RELIEF IN THIS COURT..............1

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
        CLAIM..............................................................................................................4

        A.      Coercion .........................................................................................4

        B.      Transparency..................................................................................8

        C.      Legality ..........................................................................................9

III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
        INJUNCTION....................................................................................................9

IV.     THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR ...............................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*AC Acquisitions Corp. v. Anderson, Clayton & Co.*,
    519 A.2d 103 (Del. Ch. 1986)..................................................................................................7

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...............................................................................................................8

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)..................................................................................................3

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    910 F.2d 1049 (2d Cir. 1990)................................................................................................3

*BNS Inc. v. Koppers Co.*,
    683 F. Supp. 458 (D. Del. 1988)...........................................................................................6

*Curtiss-Wright Corp. v. Kennecott Corp.*,
    504 F. Supp. 1044 (S.D.N.Y. 1980)......................................................................................6

*Data Probe Acquisition Corp. v. Datatab, Inc.*, 568 F. Supp.  1538, 1548
    (S.D.N.Y. 1983), *rev'd on other grounds*, 722 F.2d 1 (2d Cir. 1983) ...................................6

*Davidow v. LRN Corp.*,
    2020 WL 898097 (Del. Ch. Feb. 25, 2020) ..........................................................................7

*Eisenberg v. Chicago Milwaukee Corp.*,
    537 A.2d 1051 (Del. Ch. 1987)..............................................................................................7

*Espiritu Santo Holdings, LP v. L1bero Partners LP*,
    2019 WL 2240204 (S.D.N.Y. May 14, 2019), *aff'd*, 789 F. App'x 288 (2d Cir.
    2020) ......................................................................................................................................3

*In re Faiveley Transp. Malmo AB*,
    522 F. Supp. 2d 639 (S.D.N.Y. 2007) (Rakoff, J.) ...............................................................3

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)....................................................................................5

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
    2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)..........................................................................2

*Mason Capital Ltd. v. Kaman Corp.*,
    2005 WL 2850083 (D. Conn. Oct. 31, 2005) ........................................................................6

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016)..................................................................2

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................9

*Polaroid Corp. v. Disney*,
  698 F. Supp. 1169 (D. Del. 1988), *vacated in part on other grounds*, 862 F.2d
  987 (3d Cir. 1988)...............................................................................6

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)............................................................................1

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
  749 F.2d 124 (2d Cir. 1984)................................................................2

*Saddle Rock Partners Ltd. v. Hiatt*,
  2000 WL 1182793 (S.D.N.Y. Aug. 21, 2000).....................................8

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
  2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ...................................3

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)..................................................................2

*Weiss v. Samsonite Corp.*,
  741 A.2d 366 (Del. Ch. 1999)..............................................................7

*Welch Foods, Inc. v. Goldman, Sachs & Co.*,
  398 F. Supp. 1393 (S.D.N.Y. 1974)....................................................8

*WLR Foods v. Tyson Foods*,
  861 F. Supp. 1277 (W.D. Va. 1994), *aff'd*, 65 F.3d 1172 (4th Cir. 1995) ...............................5

## STATUTES

8 Del. C. § 203 .............................................................................................6

15 U.S.C.
  § 78j(b)....................................................................................................5
  § 78n(e) ................................................................................................5, 6

Foreign Sovereign Immunities Act.............................................................2

Securities Exchange Act of 1934................................................................5

Williams Act ...............................................................................................5

## RULES

Rule 14e-1 ................................................................................................................6

Rule 14e-1(a) ...........................................................................................................6

## REGULATIONS

17 C.F.R. § 240.14e-1 ..............................................................................................6

## OTHER AUTHORITIES

John C. Coffee Jr. & William A. Klein, *Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations*, 58 U. CHI. L. REV. 1207 (1991) ..........................................................................................4

## PRELIMINARY STATEMENT

In its Memorandum of Law, the Republic of Ecuador persists in trying to style this matter as a garden variety breach of contract dispute that should properly be arbitrated in England.  It is no such thing.  Plaintiffs are making an emergency request for judicial intervention to prevent the imminent consummation of a tender offer hopelessly infected by fraud.  There can be no doubt about what is really happening here.  Ecuador is waging a campaign to improperly persuade undecided bondholders to approve the tender.  That is why Ecuador is so eager to portray its proposal as fair, transparent, and contractually proper, when in fact it is coercive, non-transparent, and a flagrant violation of the indentures.

To be clear, Plaintiffs do not doubt Ecuador's interest in restructuring its debt and share its goal of putting the country on surer economic footing.  What Ecuador cannot do in pursuit of that goal, however, is make material misstatements in the marketplace in order to fraudulently drag its proposal across the finish line.  If the tender succeeds, Plaintiffs and the class of bondholders it represents will suffer irreparable harm in the form of abandoned rights and an inability to pursue monetary damages against this effectively judgment-proof Defendant.  An injunction is the only remedy that will protect against that harm and, as a result, Plaintiffs respectfully request that the Court grant their application for emergency relief.

## ARGUMENT

### I.   PLAINTIFFS ARE APPROPRIATELY SEEKING RELIEF IN THIS COURT

During yesterday's teleconference, Defendant claimed that Plaintiffs' application for an order to show cause suffered multiple, "fatal jurisdictional issues."  July 30, 2020 Hr'g Tr. at 3:22 ("Tr.").  Ecuador argued that Plaintiffs' claim was "barred by sovereign immunity."  *See* Def.'s Letter dated July 30, 2020 at 2, Dkt. 16.  But Ecuador has now abandoned that issue, as it must. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619-20 (1992) (holding that the

"commercial activity" exception to the Foreign Sovereign Immunities Act applied where Argentina issued debt denominated in U.S. dollars and employed a financial agent in this country). Ecuador also argued that this Court lacks jurisdiction because the bonds at issue do not trade in the United States. Ecuador has now understandably abandoned that issue as well, because "irrevocable liability" is incurred in the United States and, in the alternative, because title passes in the United States. *See, e.g.*, *United States v. Vilar*, 729 F.3d 62, 76 (2d Cir. 2013); *see also* Second Decl. of Michael E. Ginnings ¶¶ 9-10.

Ecuador continues to argue that the arbitration clause in the indentures prevents this Court from granting the relief Plaintiffs now seek. That jurisdictional argument, however, fares no better than the ones Defendant has otherwise discarded. Although the indentures do have an arbitration clause, the Second Circuit has made clear that "courts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 238 (2d Cir. 2016); *see also Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated, however, does not absolve the court of its obligation to consider the merits of a requested preliminary injunction; the proper course is to determine whether the dispute is 'a proper case' for an injunction."). Indeed, "district courts have been reversed where they have adopted the erroneous view that the decision to refer the dispute to arbitration strip[s] the court of power to grant injunctive relief." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020) (internal quotations omitted).

The rationale for this rule is clear: "[P]ro-arbitration policies reflected in . . . Supreme Court decisions are furthered, not weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration through a preliminary injunction. Arbitration can become a

'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990) (citations omitted); *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015).  Thus, courts in this District routinely exercise jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration.  *See, e.g.*, *Espiritu Santo Holdings, LP v. L1bero Partners LP*, 2019 WL 2240204, at *26 (S.D.N.Y. May 14, 2019), *aff'd*, 789 F. App'x 288 (2d Cir. 2020); *In re Faiveley Transp. Malmo AB*, 522 F. Supp. 2d 639, 641 (S.D.N.Y. 2007) (Rakoff, J.); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *5 (S.D.N.Y. Dec. 10, 2003).

Defendant does not mention, let alone meaningfully address, this clear precedent.  It simply asserts that this action should be in England because the indentures provides that "the Republic submits to the jurisdiction of the English courts in connection with any proceedings invoking the supervisory jurisdiction of those courts."  Def.'s Mem. of Law in Opp'n to Pls.' Motion for TRO and Prelim. Inj. at 7, Dkt. 20 ("Opp.").  But the language Defendant cites concerns Ecuador's *purported waiver of sovereign immunity*, not *an agreement of the parties* to litigate injunctions in England.  Moreover, this action concerns a tort—securities fraud—that is separate and apart from the contractual dispute that was encompassed by the parties' agreement and that will now go forward in England.  Given that the parties did not agree to England as the exclusive jurisdiction for seeking equitable relief, given that Ecuador does not have sovereign immunity in this action, and given that the clear law of this Circuit gives district courts the power and obligation to consider injunctions in anticipation of arbitration, this Court properly may, and indeed must, exercise jurisdiction over Plaintiffs' application.

II.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIM**

Plaintiffs' Complaint identifies three categories of specific misstatements that Ecuador
made in an obvious effort to fraudulently induce bondholders to tender before the deadline.  *See*
Compl. ¶¶ 28, 50-63, Dkt. 1 ("Compl.").  Much as Ecuador may try to recast these statements as
subjective opinions, they were decidedly not proffered to the marketplace as opinions.  They were
categorical, clear, and intentional misstatements of facts.

A.    **Coercion**

Ecuador made a number of misstatements relating to the coercive nature of the tender.  *See,
e.g.*, Compl. ¶ 55 ("The [Steering Committee] asserted that the Republic negotiated with them in
bad faith and characterized the process as 'coercive.'  Nothing could be further from the truth.");
*id*. ¶ 59 (Ecuador is not seeking "to compel the consent of the investor"); *id.* ¶ 61 (The Steering
Committee has "no basis to argue that they are being treated in an unequal manner").  These were
not misstatements about some minor or irrelevant procedural issues.  These were misstatements
about a critical issue confronting undecided bondholders: whether the tender was fair and whether
it would be deemed fair by other bondholders.

During the teleconference with the Court on July 30, 2020, the Court suggested that what
Plaintiffs called coercion could simply be an "incentive, an incentive that may be so good that you
don't feel like you can pass on it."  Tr. at 30:17-19.  But coercion has a special meaning and
significance in securities law, particularly as it relates to tender offers.   And coercion of
bondholders in tender offers, specifically, has been the subject of academic commentary for
decades.  *See, e.g.*, John C. Coffee Jr. & William A. Klein, *Bondholder Coercion: The Problem of
Constrained Choice in Debt Tender Offers and Recapitalizations*, 58 U. CHI. L. REV. 1207, 1221

(1991) ("But the use of coercive means that threaten bondholders with being made worse off if they decline the exchange does raise serious legal issues.").

As a preliminary matter, the Williams Act, which amended the Securities Exchange Act of 1934, established a regulatory regime for tender offers, and the Act was intentionally designed to provide protection against coercion.[1]  *See, e.g.*, *WLR Foods v. Tyson Foods*, 861 F. Supp. 1277, 1283 (W.D. Va. 1994) (explaining that the "primary purpose of the Williams Act is to protect shareholders from the coercive aspects of tender offers . . . ."), *aff'd*, 65 F.3d 1172, 1180 (4th Cir. 1995) ("The means by which the Williams Act achieves its purpose of protecting investors is by requiring disclosure of information in order to allow shareholders to make an informed decision and to prevent coercion in the tender offer context . . . .").

First, to protect investors' ability to make a free, fair, and fully-informed choice, Section 14(e) of the Exchange Act prohibits offerors from making any untrue statement of material fact or omitting any material fact necessary to make the statements not misleading in connection with the tender offer.  15 U.S.C. § 78n(e) (prohibiting offerors from making "any untrue statement of a material fact or omit[ting] [] any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading"); *accord* 15 U.S.C. § 78j(b).  In other words, whenever the offeror chooses to speak, the offeror has a duty to ensure that the statement is complete, accurate, and not misleading.  *See In re Gen. Elec. Co.  Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012).

Second, in order to ensure that the tender offer process is not coercive, Section 14(e) prohibits "any fraudulent, deceptive, or manipulative acts or practices, in connection with any

---

[1] As mentioned during the teleconference, Section 14(e) and the tender offer rules do not apply here.  *See* Tr. at 34:4-8.

tender offer," and authorizes the SEC to promulgate regulations to prevent such abuses of the tender offer process.  15 U.S.C. § 78n(e).  In that regard, the SEC promulgated Rule 14e-1, which imposes a number of requirements on offerors.  17 C.F.R. § 240.14e-1.  For example, the tender offer must be open for at least "twenty business days from the date such tender offer is first published or sent to security holders."  *Id.* § 240.14e-1(a).  The purpose of this requirement is "to ensure that required disclosure is effective" and "to give shareholders adequate time to consider the [offeror's] disclosures."  *Polaroid Corp. v. Disney*, 698 F. Supp. 1169, 1177 n.4 (D. Del. 1988), *vacated in part on other grounds*, 862 F.2d 987 (3d Cir. 1988) (vacating order denying preliminary injunction and ordering corrective disclosures); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 568 F. Supp.  1538, 1548 (S.D.N.Y. 1983) (recognizing that this timing provision "insures that the shareholder be given a predictable, adequate time period to make an intelligent investment decision"), *rev'd on other grounds*, 722 F.2d 1 (2d Cir. 1983); *Curtiss-Wright Corp. v. Kennecott Corp.*, 504 F. Supp. 1044, 1055 (S.D.N.Y. 1980) (explaining that "[t]he purpose of Rule 14e-1(a) . . . is to prevent a stampede by the shareholders to accept an offer of excessively short duration and to permit instead adequate time for reflection so as to reduce the likelihood of hasty, ill-considered decision making").

State statutes are similarly concerned with prohibiting coercion in tender offers.  *See also Mason Capital Ltd. v. Kaman Corp.*, 2005 WL 2850083, at *7 (D. Conn. Oct. 31, 2005) (noting that Connecticut and a number of other states have adopted "fair price" statutes to mitigate the coercive effects of front-loaded or two-tier tender offers); *BNS Inc. v. Koppers Co.*, 683 F. Supp. 458, 464 (D. Del. 1988) (emphasizing that 8 Del. C. § 203, Delaware's antitakeover statute, was designed to "shield shareholders from the coerciveness of front-end loaded, two-tier offers . . . .").

The law is also clear about what makes a tender offer unduly coercive.  For example, a tender offer is wrongfully coercive under Delaware law, where it either: "(i) threatens to extinguish or dilute a percentage ownership interest in relation to the interest of other stockholders; or (ii) induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer."  *Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch. 1999). *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1056 (Del. Ch. 1987) is instructive.  In that case, the Court of Chancery found that the plaintiff showed a likelihood of success on a claim of equitable coercion where, among other things, the offeror indicated that after the consummation of the transaction, management would delist the shares of holders who did not tender—a threat not unlike Ecuador's threat here to let the bonds of non-tendering bondholders go into default.

Hallmarks of coercive tenders otherwise include an inadequate or misleading disclosure of information, a short timeframe to make a decision, and strong-arming offerees into accepting inadequate terms—all features that are present in Ecuador's tender here.  *See, e.g.*, *Davidow v. LRN Corp.*, 2020 WL 898097, at *8 (Del. Ch. Feb. 25, 2020) (emphasizing that "[w]here defendants inadequately disclose all material information related to a self-tender, the self-tender is coercive."); *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 113-14 (Del. Ch. 1986) (making a factual finding that a tender offer is coercive where "a current shareholder who elects not to tender . . . is very likely, upon consummation of the . . . [t]ransaction[], to experience a substantial loss in [the] value of his holdings" and "[t]he only way . . . that a shareholder can protect himself from such an immediate financial loss, is to tender," such that the shareholder "has no effective choice as between the contending offers").

Ecuador suggests that its statements disclaiming the coercive nature of the tender are opinions or immaterial or just "generic statements."  Opp. at 10.  They were certainly not couched

as opinion; they were presented as facts.  And they were not generic factual statements, either; they were specific statements expressly targeted at falsely reassuring undecided bondholders, when in fact, the tender actually bears all the features of the coercion that is a recognized danger in tender offers.

Nor does it help Defendant to repeat the refrain that Plaintiffs are "sophisticated."  As evidenced by the declarations filed in connection with this brief, multiple bondholders have been coerced.  *See* Exs. 1-9 to Declaration of Christopher J. Clark in Further Support of Application for TRO, filed herewith.  In any event, the sophistication of Plaintiffs is irrelevant, and that is not the standard for measuring materiality.  The standard is whether a "reasonable investor" would consider the information important in deciding whether to tender.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Finally, "[l]arge as well as small investors are protected by the Securities Acts," and "[s]ophisticated investors, like all others, are entitled to the truth."  *Welch Foods, Inc. v. Goldman, Sachs & Co*., 398 F. Supp. 1393, 1398-99 (S.D.N.Y. 1974) (internal quotation marks and citation omitted); *see also Saddle Rock Partners Ltd. v. Hiatt*, 2000 WL 1182793, at *4 (S.D.N.Y. Aug. 21, 2000) (an investor's "'sophistication' does not detract from the fact that [their] claim of fraudulent conduct flows from the same course of events – the series of statements made by defendants and their effect on the market price of [a company] . . . and gives rise to the same legal liabilities, as is true for the class members it seeks to represent").

## B.  Transparency

Ecuador also made a number of misstatements regarding the transparency of the process leading up to the proposal.  *See, e.g.*, Compl. ¶ 51 ("The Republic is committed to a . . . transparent process."); *id.* ¶ 57 ("During the month of June, the Republic formally approached the Minority Committee and attempted to engage in confidential negotiations, but the advisor to the Minority Committee spent two weeks negotiating the wording of Non-Disclosure Agreements . . .").

8

Ecuador suggests that these are merely "opinions" regarding the process.  Opp. at 13.  Not so.
They are assertions of fact—they claim that they are, in fact, committed to a "transparent process"
and that they did, in fact, attempt to engage the Minority Committee, *i.e.*, the Steering Committee.
These statements mattered because undecided bondholders look to the Steering Committee, which
represents major investors in the bonds, for leadership.  Statements such as these were intended to
send a signal to undecided bondholders that the tender is the product of good order and is, as a
result, worth pursuing.

      **C.**    **<u>Legality</u>**

      Ecuador also made the categorical assertion that it "is acting within the four corners of our
indentures, including the modification provisions available upon obtaining the requisite consent
from bondholders."  Compl. ¶ 53.  The Defendant suggests, in its brief, that this was a non-
actionable opinion.  Opp. at 12.  But Ecuador did not say "we believe" that the proposal is within
the four corners of our indentures.  That would have been an opinion.  *See, e.g.*, *Omnicare, Inc. v.
Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (suggesting
statements such as "we believe we are obeying the law" would not, on its own, give rise to
liability).  Ecuador asserted the legality of its action as fact.  That assertion is false and materially
so, because, again, it was intended to fraudulently induce undecided bondholders into tendering
and giving up their rights to challenge a proposal that, in fact, violated the contractual guarantees
Ecuador has made to them in the form of the No Less Favorable Treatment Provision.

**III.**    **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
INJUNCTION**

      In their opening brief, Plaintiffs identified three ways in which they will suffer irreparable
harm absent judicial intervention: first, Plaintiffs will be forced to tender, and in so doing, give up
valuable rights, including the protections afforded by the No Less Favorable Treatment Provision.

Defendant glosses over this and focuses instead on the fact that Plaintiffs made a demand for money damages in the arbitration.  The two are not mutually exclusive.  Should the tender go forward, of course, Plaintiffs will suffer money damages.  The point of this action is to prevent the non-monetary harm to which Plaintiffs will also be subjected.  Second, after the completion of the tender, it will be impossible to "unscramble the eggs."  Defendant steadfastly refuses to engage with that argument at all.  Third, Plaintiffs will suffer an inability to collect on any money damages it might ultimately obtain.  Defendant suggests there is little evidence for this proposition, despite having told the Court yesterday that Ecuador is "suffering massive, massive financial problems as a result of COVID-19 and oil prices."  Tr. at 21:4.  Plaintiffs surely have established irreparable harm.

## IV.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR

As the Court stated during the teleconference, normally when there are allegations of problems with a tender offer, a "TRO is appropriate for the it's-impossible-to-unscramble-the-eggs problem."  Tr. at 20:4-5.  Here, having proven a likelihood of success on the merits as well as irreparable harm, the balance of equities tips in Plaintiffs' favor.  And although Ecuador warned the Court that any delay will be disastrous for its economy, in fact, Ecuador is, as discussed during the teleconference, currently soliciting consents to delay the "Settlement Date" associated with the tender from August 20, 2020 to September 1, 2020.  *See* Ex. A to Second Declaration of Michael E. Ginnings, Dkt. 25-1.  Ecuador's claim that time is of the essence is utterly belied by its own actions.

10

Dated: July 31, 2020
    Greenwich, Connecticut

Respectfully submitted,

LATHAM & WATKINS LLP

/s/ Christopher J. Clark
Christopher J. Clark
chris.clark@lw.com
885 Third Avenue
New York, New York 10022
(212) 906-1200
(212) 751-4864

*Attorney for Plaintiffs Contrarian Emerging Markets, L.P., GMO Emerging Country Debt Fund, GMO Emerging Country Debt Investment Fund plc, and GMO Emerging Country Debt (UCITS) Fund*